1                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE SOUTHERN DISTRICT OF TEXAS

3                            MCALLEN DIVISION

4    UNITED STATES OF AMERICA        §      CASE NOS. 7:20-CR-00240-1
                                      §                7:20-CR-00240-2
5    VERSUS                           §                7:20-CR-00240-3
                                      §      MCALLEN, TEXAS
6    DANIEL SEPULVEDA (01)            §      TUESDAY,
     EVARISTO SEPULVEDA, III (02)     §      FEBRUARY 11, 2020
7    JUAN INDALECIO GARCIA (03)       §      10:37 A.M. TO 12:28 P.M.

8                            DETENTION HEARING
             (PARTIAL TRANSCRIPT - MORNING SESSION ONLY)
9

                   BEFORE THE HONORABLE PETER M. ORMSBY
10                     UNITED STATES DISTRICT JUDGE

11

12        APPEARANCES:                        (SEE NEXT PAGE)

13        ELECTRONIC RECORDING OFFICER:   OMAR ORTA

14        OFFICIAL INTERPRETERS:          WOODY LEWIS
                                          MARIA FORAKER
15

16

17

18

19

20                   TRANSCRIPTION SERVICE BY:

21             JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                     935 ELDRIDGE ROAD, #144
22                   SUGAR LAND, TEXAS 77478
                       Tel: 281-277-5325
23                 www.judicialtranscribers.com

24
         Proceedings recorded by electronic sound recording;
25          transcript produced by transcription service.

1                              APPEARANCES:

2

3   FOR THE GOVERNMENT:              US ATTORNEY'S OFFICE
                                     Patricia Cook Profit, Esq.
4                                    1701 W. Business Hwy 83
                                     Suite 600
5                                    McAllen, Texas   78501
                                     956-618-8010
6
    FOR DEFENDANT
7   DANIEL SEPULVEDA:                ATTORNEY AT LAW
                                     Daniel Antonio Sanchez, Esq.
8                                    501 E. Tyler
                                     Harlingen, Texas   78550
9                                    956-425-5297

10  FOR DEFENDANT
    EVARISTO SEPULVEDA, III:         LAW OFFICE OF GILBERT FALCON
11                                   Gilberto Falcon, Esq.
                                     404 N. Britton Avenue
12                                   Rio Grande City, Texas   78582
                                     956-437-5836
13
    FOR DEFENDANT
14  JUAN INDALECIO GARCIA:           ATTORNEY AT LAW
                                     Gocha Allen Ramirez, Esq.
15                                   515 E. Second Street
                                     Rio Grande City, Texas   78582
16                                   956-487-4585

17

18

19

20

21

22

23

24

25

1                              INDEX

2

3   WITNESS:                   Direct   Cross   Redirect   Recross

4   ARIANA SEPULVEDA
       By Mr. Sanchez:           13      .        .          .
5      By Ms. Profit:             .     17        .          .

6   JULISSA PENA
       By Mr. Falcon:            25      .        .          .
7      By Ms. Profit:             .     31        .          .

8   RODOLFO CARLOS SALINAS, JR.
       By Mr. Ramirez:           37      .        .          .
9      By Ms. Profit:             .     43        .          .

10  MELISSA FERNANDA ORTA DE LEON
       By Mr. Ramirez:           50      .       69          .
11     By Ms. Profit:             .     63        .          .

12  NORMA LINDA VILLARREAL
       By Mr. Ramirez:           70      .        .          .
13     By Ms. Profit:             .     80        .          .

14


15
    EXHIBITS:                  Marked   Offered   Received
16
     (None offered.)
17

18

19

20

21

22

23

24

25

1        MCALLEN, TEXAS; TUESDAY, FEBRUARY 11, 2020; 10:37 A.M.

2          (Official interpreter utilized for translation.)

3            THE COURT:  We'll call next Criminal Case No.

4    M-20-240, United States versus Daniel Sepulveda.

5            MS. PROFIT:  The Government is present and ready,

6    Your Honor.

7            THE COURT:  If you could please come forward right

8    up here, (indicating), sir?

9            MR. SANCHEZ:  Dan Sanchez for the Defendant.

10   We're present and ready, Your Honor.

11           THE COURT:  Okay.  Also Evaristo Sepulveda, III.

12           MR. FALCON:  Your Honor, Gilberto Falcon, on

13   behalf of Evaristo Sepulveda.  He's present and ready.

14           THE COURT:  Okay.  And also in the same case,

15   Juan Indalecio Garcia.

16           MR. RAMIREZ:  Good morning, Your Honor.

17           G. Allen Ramirez, for Mr. Garcia.  We're also

18   present and ready.

19           THE COURT:  And, Mr. Garcia, I'd actually called

20   this case at the end here because I was thinking you were

21   going to be held up somewhere or had some other obligation,

22   but you're here.

23           We do need to address the arraignment as to each

24   of these gentlemen, as to each of the Defendants so why

25   don't we go ahead and take that up first?

1          Both Mr. Sepulvedas and Mr. Garcia, I do need to

2   ask you questions under oath for the arraignment in your

3   case.

4          If you could please raise your right hand?  The

5   clerk will place you under oath.

6       (Defendants sworn.)

7          THE COURT:  Okay.  Thank you.

8          And could we have announcements from counsel as

9   far as the arraignments?

10         MR. SANCHEZ:  As to Mr. Daniel Sepulveda,

11  Your Honor, we waive arraignment at this time, enter a plea

12  of not guilty.

13         THE COURT:  Okay.  And, Mr. Sanchez, you were able

14  to review the Indictment with him and believe he understands

15  what's being alleged?

16         MR. SANCHEZ:  Yes, Your Honor, I did review the

17  Indictment and he understands the nature of his charges and

18  he is competent.

19         THE COURT:  Okay.  And you do believe him to be

20  competent at this point?

21         MR. SANCHEZ:  Yes, Your Honor.

22         THE COURT:  And he wishes to waive also the

23  reading of the Indictment; is that what you're saying?

24         MR. SANCHEZ:  Yes, Your Honor.

25         THE COURT:  Okay.  Thank you.  And, Mr. Falcon, as

1  to Mr. Evaristo Sepulveda?

2          MR. FALCON:  Yes, Your Honor.  We have received a

3  copy of the Indictment.  We have reviewed him, my client and

4  myself.  I believe that my client understands the nature of

5  the charges and the consequences of the charges.  I believe

6  that he is competent today, Your Honor.  He's going to be

7  entering a plea of not guilty and waive the formal reading

8  of the Indictment.

9          THE COURT:  Okay.  Thank you.  And the same?

10          MR. RAMIREZ:  Yes, Your Honor.  We've also -- I've

11  reviewed the Indictment with Mr. Garcia.  I find him to be

12  competent.  He understands the nature of the charges filed

13  against him.  I anticipate that he's also going to waive the

14  formal reading of the Indictment, enter a plea of not

15  guilty.

16          THE COURT:  Okay.  Thank you.  So let me just

17  start by confirming with each of you that we have your names

18  correctly in the Indictment that was filed.  I think I might

19  have done this the other day, but for purposes of your

20  arraignment, just to confirm that it is correct.

21          And beginning with Daniel Sepulveda, sir, that's

22  your correct name; is that right?

23          DEFENDANT DANIEL SEPULVEDA:  Yes, Your Honor.

24          THE COURT:  And, Evaristo Sepulveda, III, is that

25  right, sir?

1          DEFENDANT EVARISTO SEPULVEDA:  Yes, sir.

2          THE COURT:  And, Juan Indalecio Garcia, is that

3    correct, sir?

4          DEFENDANT GARCIA:  That's correct, Your Honor.

5          THE COURT:  I also just want to confirm with you

6    what the attorneys have indicated and that is that each of

7    you has had the opportunity to review with your attorney the

8    Indictment that was filed and to be able to discuss with

9    counsel the charges in the Indictment.

10          And, Mr. Daniel Sepulveda, you've been able to do

11   that; is that correct, sir?

12          DEFENDANT DANIEL SEPULVEDA:  Yes, Your Honor.

13          THE COURT:  And, Mr. Evaristo Sepulveda, you've

14   been able to do that, sir?

15          DEFENDANT EVARISTO SEPULVEDA:  Yes, Your Honor.

16          THE COURT:  And, Mr. Garcia?

17          DEFENDANT GARCIA:  Yes, sir.

18          THE COURT:  After reviewing the Indictment with

19   your attorneys, I also want to be sure that you're each able

20   to understand the nature of the charges that are being

21   alleged and that you understand the possible penalties that

22   could be imposed as to those.

23          And, Mr. Daniel Sepulveda, do you understand those

24   things, sir?

25          DEFENDANT DANIEL SEPULVEDA:  Yes, Your Honor.

1           THE COURT:  And, Mr. Evaristo Sepulveda?

2           DEFENDANT EVARISTO SEPULVEDA:  Yes, Your Honor.

3           THE COURT:  Mr. Garcia?

4           DEFENDANT GARCIA:  Yes, sir.

5           THE COURT:  Your attorneys have indicated that

6  each of you wish to waive the reading of the Indictment.

7  All that means is that we won't read the Indictment out loud

8  in court here this morning.  I just want to confirm with you

9  that that's correct, that you wish to waive that.

10          And, Mr. Daniel Sepulveda, you do want to waive

11  the reading of that?

12          DEFENDANT DANIEL SEPULVEDA:  Yes, Your Honor.

13          THE COURT:  And, Mr. Evaristo Sepulveda?

14          DEFENDANT EVARISTO SEPULVEDA:  Yes, sir.

15          THE COURT:  And, Mr. Garcia?

16          DEFENDANT GARCIA:  Yes, Your Honor.

17          THE COURT:  And I understand also that each of you

18  wish to plead not guilty to the charges that are alleged in

19  the Indictment.  I just need to have each of you announce

20  your plea at this point.

21          And, Mr. Daniel Sepulveda, as to the charges

22  alleged in the Indictment, how do you wish to plead at this

23  time, guilty or not guilty?

24          DEFENDANT DANIEL SEPULVEDA:  Not guilty.

25          THE COURT:  And, Mr. Evaristo Sepulveda?

1          DEFENDANT EVARISTO SEPULVEDA:  Not guilty.

2          THE COURT:  And, Mr. Garcia?

3          DEFENDANT GARCIA:  Not guilty, Your Honor.

4          THE COURT:  Thank you.  I find, based on the

5    representation of counsel, that each of these gentlemen is

6    competent for purposes of their arraignment.  They've each

7    entered pleas of not guilty to the charges alleged in the

8    Indictment.

9          This case is assigned to Judge Crane.  The final

10   pretrial conference is set for April 3rd at 9:00 o'clock.

11   Jury selection will be April 7th at 9:30.  The deadline for

12   motions will be February 25th.  The Government's responses

13   will be due March 17th.  And the deadlines for motions for

14   continuance will be March 20th.  So those dates will control

15   further proceedings in your case here for each of you.  Your

16   attorneys will be able to help you in addressing your case

17   on that schedule or otherwise assisting you in the best way

18   possible based on the circumstances here.

19         We also need to address the issue of bond as to

20   each of the Defendants.  There is a presumption against bond

21   that does apply under federal law, based on the nature of

22   the charges that are being alleged against each of the

23   Defendants.  It is a rebuttable presumption, but it does

24   shift the burden of moving forward to the Defendant.

25         And I will take notice of the Factual Information

1    that's set out in the Pretrial Services Report as to each of

2    the Defendants.  I'll take notice of that to the extent it's

3    not clarified or corrected in connection with the hearing.

4    And so we do need to address bond separately as to each of

5    the Defendants.

6           I guess before -- the burden is on the Defendants

7    as far as going forward but, Ms. Profit, did you plan to

8    present evidence?

9           MS. PROFIT:  Your Honor, the Government intends at

10   this point to rely on the burden and ask the Defendant to

11   present evidence with respect to each defendant.  If it

12   becomes necessary after that, then the Government will

13   proceed with putting on a witness.

14          THE COURT:  Okay.

15          MS. PROFIT:  But it is their burden to proceed.

16          THE COURT:  Right.  The reason I was asking is

17   that if the Government planned to present evidence anyway,

18   then it might be more efficient if we just did that as to

19   all three, but in any event -- so beginning with --

20   Mr. Daniel Sepulveda is listed first in the Indictment.

21          And, Mr. Sanchez, as to the issue of bond -- and

22   actually we can probably have Mr. Evaristo Sepulveda and

23   counsel as well as Mr. Garcia and counsel, you can probably

24   just go ahead and have a seat at counsel table and we'll

25   take this up as to each of the Defendants separately here.

1          MS. PROFIT:  I'm thinking of Judge Vela as the

2  train goes by, Your Honor.

3          THE COURT:  Yeah.  He was going to get after

4  the --

5          MS. PROFIT:  Conductor or the engineer.

6          THE COURT:  Right, yes.  Okay.  And, Mr. Sanchez,

7  is there evidence or argument you wish to present as to

8  Mr. Sepulveda for -- on the issue of bond?

9          MR. SANCHEZ:  Your Honor, I have not discussed the

10  presentation of evidence at this time, but if I could have a

11  few minutes to confer with my client --

12          THE COURT:  Sure.

13          MR. SANCHEZ:  -- before we do that?

14          THE COURT:  Yes, sir.  And that's fine.

15          And so do you want to take a recess for a few

16  minutes or how do you think it would be --

17          MR. SANCHEZ:  Yes, a short recess.

18          THE COURT:  Okay.  So we'll go ahead and do that.

19  And then also, Mr. Falcon and Mr. Ramirez, if you all -- do

20  you know how you want to proceed as far as presenting

21  witnesses or how you want to go forward or just argument?

22          MR. RAMIREZ:  Judge, I have four witnesses to

23  present.

24          THE COURT:  Okay.

25          MR. FALCON:  I have one witness, Your Honor.

1        THE COURT:  Okay.  And so we'll be aware of what

2   we're going to be addressing.  So I will go ahead and take a

3   recess for a few minutes and we'll proceed from there.

4        (Recess taken from 10:45 a.m. to 10:58 a.m.)

5                        AFTER RECESS

6        THE COURT:  Okay.  You can come forward,

7   Mr. Sepulveda.  And I should have mentioned this actually.

8   It applies to all the Defendants, but the Defendants do have

9   the right to have additional time to prepare as well in

10  light of the Pretrial Report, but if you're ready to

11  proceed, we can do that also.

12        And, Mr. Sanchez, did you wish to go forward?

13        MR. SANCHEZ:  Yes, Your Honor.

14        THE COURT:  Okay.  And I understand you have a

15  witness that you want to present?

16        MR. SANCHEZ:  That's correct.

17        THE COURT:  Okay.  And you can have a seat there

18  at counsel table, Mr. Sepulveda, with your attorney.

19        MS. PROFIT:  Your Honor, can the Government have

20  two of the agents on this case --

21        THE COURT:  Yes, that's fine.

22     (Pause in the proceedings.)

23        THE COURT:  Okay.  And, Mr. Sanchez, you had a

24  witness you wish to call?

25        MR. SANCHEZ:  Yes, Your Honor.  We call

1   Ariana Sepulveda.  May I sit to question?

2              THE COURT:  Okay.  Yes, sir.  Yes.  Thank you.

3              And, Ms. Sepulveda?  There she is.

4              Ma'am, if you'd please raise your right hand?  The

5   clerk will place you under oath.

6        (Witness sworn.)

7              THE COURT:  Okay.  Please be careful.  There's a

8   little bit of stuff there.

9              MR. SANCHEZ:  Please state your name for the

10  Record.

11             THE WITNESS:  Ariana Sepulveda.

12              DIRECT EXAMINATION OF ARIANA SEPULVEDA

13  BY MR. SANCHEZ:

14  Q    And how old are you, Ms. Sepulveda?

15  A    Twenty-five.

16  Q    And what is your relation to Mr. Daniel Sepulveda?

17  A    He's my husband.

18  Q    And how long have you been married?

19  A    Eight years.

20  Q    Do you all have any children?

21  A    Yes.

22  Q    How many?

23  A    One.

24  Q    A boy or a girl?

25  A    Boy.

ARIANA SEPULVEDA – DIRECT BY MR. SANCHEZ                    14

1    Q    And what is his name?

2    A    Daniel Sepulveda, Jr.

3    Q    And how old is he?

4    A    Five years old.

5    Q    And where do you live, Ms. Sepulveda?

6    A    Rio Grande City.

7    Q    And what's your address?

8    A    25 Midway Road.

9    Q    How long have you lived there?

10   A    Three years.

11   Q    Before that, where did you live?

12   A    My parents' house.

13   Q    And who lived with you there?

14   A    Where?

15   Q    At your parents' house.

16   A    My parents, me and my husband.

17   Q    Okay.  Your husband lived with you there?

18   A    Yes.

19   Q    Okay.  And currently do you work?

20   A    No.

21   Q    What is your function or status as his wife right now?

22   A    What was that?

23   Q    What do you do other than you're his wife, what's

24   your --

25   A    I'm a full-time student and I take care of my home and

1   my child.

2   Q    Where are you a student?

3   A    South Texas College Rio Grande.

4   Q    Okay.  And Mr. Sepulveda, does he work?

5   A    Yes.

6   Q    What is his job?

7   A    He has a landscape business.

8   Q    And his job provides all the income for your home?

9   A    Yes.

10  Q    And do you provide any income for the home?

11  A    No.

12  Q    What kind of bills do you have at home that require

13  income?

14  A    My utility bills and my cars.

15  Q    What vehicles do you have?

16  A    A truck and a SUV.

17  Q    Okay.  Are those paid off?

18  A    No.

19  Q    How much would you say is owed on those vehicles, if

20  you know?

21  A    40-some thousand dollars or maybe more.  I'm not sure.

22  Q    Okay.  And what is the monthly payment on them?

23  A    I'm not sure.  He would take care of the bills.

24  Q    And if he's detained and locked up, are you going to be

25  able to pay those bills?

1   A     No.

2   Q     What about your bills at home, your utilities, would

3   you be able to pay those?

4   A     No.

5   Q     If he's not released to come home and work and run his

6   business, is there anyone else available to run his

7   business?

8   A     No.

9   Q     Who's mainly the one that operates his business?

10  A     Him.

11  Q     Okay.  So without that income, what would happen to you

12  and your son?

13  A     The utility bills will be shut down and the cars will

14  be repoed.

15  Q     Okay.  What about your school, are you paying for your

16  school?

17  A     Yes.

18  Q     Would you be able to continue to pay for your school?

19  A     No.

20  Q     Okay.  So if he is detained, that's going to have a

21  huge impact on you and your son?

22  A     Yes.

23  Q     Okay.  There's a concern that because of the charges

24  pending against him he may not return to court and show up

25  to court.

ARIANA SEPULVEDA - DIRECT BY MR. SANCHEZ                    17

1        Do you believe that if he's released, that he will

2   continue to work his landscaping business and when he has to

3   show up to court, he'll show up to court?

4   A    Yes, he will.

5   Q    Do you have a belief that he may run and try to run

6   away from these charges that are pending?

7   A    Of course not.

8   Q    Okay.  And as far as -- since you've been with him,

9   have you ever been aware that he's been arrested or been in

10  trouble with the law?

11  A    Not sure.  I think at the past, but I'm not really

12  sure.

13  Q    Okay.  But while you've been with him, he's not been on

14  any sort of probation or conditions of release by any court

15  that you're aware of?

16  A    No.

17  Q    Okay.  Are you asking the Court to give him a bond and

18  release him pending this trial?

19  A    Yes.

20        MR. SANCHEZ:  Pass the witness, Your Honor.

21        THE COURT:  Okay.  Ms. Profit.

22        MS. PROFIT:  Mrs. Sepulveda, my name is Patricia

23  Profit and I represent the United States.

24            CROSS-EXAMINATION OF ARIANA SEPULVEDA

25  BY MS. PROFIT:

1   Q    Isn't it true that you are aware of your husband's

2   involvement in this incident in January of 2019; isn't that

3   true?

4   A    No.

5   Q    Mrs. Sepulveda, you are aware that the Government

6   seized your phone, correct?

7   A    Yes.

8   Q    And are you aware of the fact that in reviewing the

9   contents of the calls on that phone that it shows that you

10  were instructed by your husband to delete all your messages

11  in your phone; are you aware of that?

12  A    No.

13  Q    Are you aware of the fact that you're now under oath?

14  A    I'm in what?

15  Q    Are you aware of the fact that you're testifying under

16  oath and that you're sworn to tell the truth; isn't that

17  correct?

18  A    Yes.

19  Q    Isn't that what you did?

20  A    Yes.

21  Q    Are you aware of the fact that your husband fled to

22  Reynosa after that incident in January of 2019?

23  A    No.

24  Q    So you did not have a conversation with your husband

25  where you discussed the fact that he was in Reynosa and he

1  suggested that you come over to Reynosa?

2  A    No.

3  Q    There was no such conversation?

4  A    No.

5  Q    There was no text messages?

6  A    No.

7  Q    There's no text messages that would prove that you're

8  lying now before the Court?

9  A    No.

10  Q    Now at the time in -- a search warrant was executed at

11  your house, correct?

12  A    Yes.

13  Q    And $83,000 was seized at that time; isn't that true?

14  A    I'm not sure.

15  Q    So you were there at the time of the search warrant and

16  you are unaware of the fact that the Government seized

17  $83,000 and that was in August of 2019?

18  A    I believe so.

19  Q    Do you remember the search warrant?

20  A    Yes.

21  Q    But you're testifying before this Court that you are

22  unaware of the fact that $83,000 was seized at that time,

23  $83,000 in cash.

24  A    I don't know the amount.

25  Q    You knew that there was cash that was seized.

 1   A     No.

 2            MS. PROFIT:  I have no further questions of this

 3   witness, Your Honor.

 4            THE COURT:  Okay.  And, Ms. Sepulveda, are you

 5   all -- did you all buy the house that you're in now or are

 6   you renting that or?

 7            THE WITNESS:  We bought it.

 8            THE COURT:  Okay.  And so do you have payments or

 9   that's paid for?

10            THE WITNESS:  It's paid.

11            THE COURT:  And, ma'am, what type of classes are

12   you taking at STC?

13            THE WITNESS:  Teaching, for teaching.

14            THE COURT:  So like elementary school or?

15            THE WITNESS:  Yes.

16            THE COURT:  Okay, very good.  All right.  Thank

17   you.

18            Mr. Sanchez, was there -- do you have any other

19   questions for Ms. Sepulveda?

20            MR. SANCHEZ:  No further questions, Your Honor.

21            THE COURT:  Okay.  Thank you very much, ma'am.

22            THE WITNESS:  Thank you.

23        (Witness steps down.)

24            THE COURT:  And was there -- I'll hear any

25   arguments in just a moment, but was there any other evidence

1   that you wanted to present, Mr. Sanchez, at this time?

2        MR. SANCHEZ:  No, Your Honor.

3        THE COURT:  Okay.  And, Ms. Profit, as far as the

4   Government, is there evidence you wish to present?

5        MS. PROFIT:  The Government will present the

6   testimony of the agent, but I would prefer that we go

7   through the other defendants before we do that.

8        But frankly by way of proffer, we know that there

9   were phone messages between Mrs. Sepulveda and her husband

10  and we know that in those text messages between

11  Mrs. Sepulveda and her husband, they -- she discussed with

12  him the fact that he had fled into Mexico.  He discussed

13  with her the fact that she should come to Mexico.  He

14  discussed with her the fact that they were safe in Mexico.

15  And, of course, there was the fact that $83,000 was seized

16  from the house.

17        THE COURT:  Okay.

18        MS. PROFIT:  We find her testimony to be

19  incredulous at best.

20        THE COURT:  Well, I don't think we need to

21  characterize that in that way, but I see your point.  And

22  that's fine.  That's what I was getting to earlier.  If we

23  are going to hear testimony, it'd probably be more efficient

24  to hear -- have the witness testify once or however you want

25  to present the evidence.

1          And, Ms. Profit, I also just wanted to note

2   that -- so I'm aware of some information related to this

3   case based on applications that were filed under seal, but

4   for purposes of the bond determination, I really can't base

5   a decision on something that the Defendants aren't aware of

6   and so I did want to just note that for whatever the

7   Government wishes the Court to consider for purposes of

8   bond, you would need to like present that if it's not

9   already in the Record somewhere because then it wouldn't be

10  appropriate or fair to base a decision on something that's

11  under seal and that's not --

12          MS. PROFIT:  I'm fully aware of what the Court is

13  saying.

14          THE COURT:  Right.

15          MS. PROFIT:  Unfortunately I did not realize that

16  that woman would be willing to take the stand and lie to the

17  extent that she did.

18          MR. SANCHEZ:  Your Honor, I object to --

19          THE COURT:  Well, right.

20          MR. SANCHEZ:  -- the characterization of the

21  testimony unless they're going to present some evidence and

22  had the --

23          THE COURT:  Right.  I think we can forgo that,

24  Ms. Profit.

25          So how do you think would -- just if we heard the

1  witnesses from all three defendants and then the Government

2  presents evidence and then --

3          MS. PROFIT:  Yes, Your Honor.  Because the

4  presumption still applies and they have not -- and the

5  Government -- they still have the burden of going forward

6  and we've done it this way before.

7          THE COURT:  Right.  Well, any objection proceeding

8  in that way, Mr. Falcon or Mr. Ramirez or Mr. Sanchez?  I

9  mean, basically we're talking about is that the Government

10  is going to present some testimony and if we have you all go

11  ahead and proceed, we'll go forward next with any evidence

12  by -- on behalf of Mr. Evaristo Sepulveda and then anything

13  that Mr. Garcia wishes to present and then the Government

14  will present their evidence and that way you all can cross-

15  examine the witness at the same time rather than sort of do

16  things three separate times as far as the Government's

17  witness; is there any objection to that?

18          MR. FALCON:  No objection, Your Honor.

19          MR. RAMIREZ:  I wouldn't have any objection

20  either.

21          MR. SANCHEZ:  The only thing, Your Honor, as long

22  as we understand that the Court is going to consider each --

23          THE COURT:  Right.

24          MR. SANCHEZ:  -- individually, not as a group.

25          THE COURT:  Correct.  Right.  And that's a good

1  point and that definitely would need to be done here because

2  each of these individuals -- it's a separate determination,

3  the bond determination based on the factors of the Bail

4  Reform Act so that is -- I certainly do have that in mind so

5  that -- and you certainly can point out aspects of the

6  evidence that don't apply to your respective clients but --

7  so let's proceed in that way then and we'll come back and

8  hear argument as far as Mr. Sepulveda a little bit later

9  and -- Mr. Daniel Sepulveda.

10          But go ahead and proceed with evidence that you

11  might want to present, Mr. Falcon, on behalf of Mr. Evaristo

12  Sepulveda.

13          MR. FALCON:  Yes, Your Honor.  At this time, I

14  would call Julissa Sepulveda.

15          THE COURT:  Okay.  You can come forward, ma'am.

16      (Pause in the proceedings.)

17          THE COURT:  Okay.  If you'd please raise your

18  right hand?

19      (Witness sworn.)

20          THE COURT:  Okay.  Ma'am, be careful.  There's a

21  little step there.

22          MR. FALCON:  May I proceed, Your Honor?

23          THE COURT:  Yes, sir.  And if you could pull the

24  microphone just a little bit closer, Mr. Falcon --

25          MR. FALCON:  Thank you.

 1          THE COURT:  -- so we can hear you better?

 2              DIRECT EXAMINATION OF JULISSA PENA

 3   BY MR. FALCON:

 4   Q    Can you please state your name?

 5   A    Julissa Pena.

 6   Q    And where are you --

 7   A    It's not legally --

 8   Q    I'm sorry?

 9   A    Legally Julissa Pena.

10   Q    And where are you from, ma'am?

11   A    From Rio Grande City.

12   Q    Okay.  Do you know Mr. Evaristo Sepulveda, III?

13   A    Yes.

14   Q    How do you know him, ma'am?

15   A    He's my husband.

16   Q    And for how long have you known him?

17   A    We've been married for nine years.

18   Q    And where does he reside?

19   A    In Rio Grande City.

20   Q    And what is the address?

21   A    27 Midway Road.

22   Q    Okay.  And you just indicated that you have been

23   married for nine years?

24   A    Yes.

25   Q    Okay.  Do you have any children?

1   A    Yeah, we have two children.

2   Q    Okay.  What are their ages?

3   A    My daughter, XXXXXXXX XXXXXXXXX, she's seven years old.

4   And my son is XXXX XXXXX XXXXXXXXX, he is four years old.

5   Q    And obviously they reside with you too, correct?

6   A    Yes, they do.

7   Q    Okay.  And since when have you resided in this

8   particular home?

9   A    We completed a year in December.

10  Q    Okay.  So you've been there since -- for about a --

11  A    December up to --

12  Q    For about a year, correct?

13  A    Yes.

14  Q    And do you rent or own this house?

15  A    We own.

16  Q    Okay.  And since when have you owned this house?

17  A    Since that -- since December of last year.

18  Q    Okay.  Now if Mr. Sepulveda was to be released out on

19  bond, would he go back to that same location, to that same

20  address?

21  A    Yes, he would.

22  Q    Okay.  And as far as you're concerned, is Mr. Sepulveda

23  a US citizen?

24  A    Yes, he is.

25  Q    Okay.  Does he have a passport?

1  A     No, he does not.

2  Q     Okay.  Does he go to Mexico?

3  A     No, he does not.  He just goes for his braces.

4  Q     Would that be for doctors' appointments?

5  A     Yes.

6  Q     Okay.  Does he own any property in Mexico?

7  A     No.

8  Q     Does he have any family in Mexico?

9  A     No, he does not.

10  Q     Okay.  Does he have any businesses in Mexico?

11  A     No, he does not.

12  Q     Okay.  So the only ties that he's got to Mexico is that

13  he goes to the doctors?

14  A     Uh-huh.

15  Q     Okay.  And how often is that, ma'am?

16  A     Once every two months, once a month.

17  Q     Okay.  And other than that, he doesn't go to Mexico?

18  A     No.

19  Q     Okay.  And if the Court were to set a bond on

20  Mr. Sepulveda, do you think that he'll flee to Mexico?

21  A     No.

22  Q     Do you think that he will make all his court

23  appearances?

24  A     Yes, he would.

25  Q     Okay.  Do you think that if the Court considers a bond,

1  that there's going to be a risk that Mr. Sepulveda is not

2  going to appear in the future?

3  A    No.

4  Q    Okay.  So he will, in your opinion, make all his

5  court --

6  A    Yes, for sure.

7  Q    I'm sorry, strike that.

8         In your opinion, do you think that he's going to

9  make all court appearances?

10  A    Yes, he will.

11  Q    Okay.  Now I want to talk to you about Mr. Sepulveda's

12  employment history.

13  A    Okay.

14  Q    I know that you've told me that he's been -- you've

15  been married for nine years, correct?

16  A    Uh-huh.

17  Q    And since how long have you known Mr. Sepulveda?

18  A    I have known him for 14 years.

19  Q    Okay.  Now can you describe to the Court

20  Mr. Sepulveda's employment history?  What is his primary

21  occupation?

22  A    Right now he is unemployed.

23  Q    I'm sorry?

24  A    Right now he is unemployed.

25  Q    Okay.  And does he do anything to earn a living?

1  A    He does landscaping.

2  Q    Okay.  Does he have a business for that?

3  A    No, he does not.

4  Q    Okay.  He just does it on his own?

5  A    Uh-huh.

6  Q    Is that a "yes"?

7  A    Yes.

8  Q    And for how long has he been doing that?

9  A    For about a year.

10 Q    Okay.  And prior to his landscaping business, where was

11 he employed?

12 A    He worked in pipelines.

13 Q    Okay.  And where was that, ma'am?

14 A    He would travel, like he was occupied by Strike

15 Construction.

16 Q    Okay.  And for how long has he worked as a pipeliner?

17 A    For eight years.

18 Q    Okay.  And before that, do you know where he was

19 employed?

20 A    No.

21 Q    Okay.  So as far as you're concerned for most of the

22 time that you all have been married --

23 A    Uh-huh.

24 Q    -- he's been a pipeliner.

25 A    Yes.

1  Q    And do you know approximately how much he was making a

2  month while he was a pipeliner?

3  A    He was in charge of all the building but he would be

4  paid.

5  Q    Okay, very well.  As far as you're concerned, does

6  Mr. Sepulveda have any health issues --

7  A    No, he does not.

8  Q    -- any major health --

9  A    No.

10  Q    Any mental issues?

11  A    No.

12  Q    Okay.  As far as you're concerned, is he a danger to

13  anybody in your community?

14  A    No, he's not.

15  Q    Okay.  Is he a violent person?

16  A    No.

17  Q    How would you describe his character?

18  A    He's very -- he's a great father.  He's very well

19  liked.  He's very nice.

20  Q    Okay.  So you don't think that he's going to be a

21  danger to anybody in your community?

22  A    I'm sure he's not.

23  Q    Do you think that he is a good candidate for bond?

24  A    Yes, he is.

25  Q    Okay.  Now if the Court were to set a bond on

1  Mr. Sepulveda and impose conditions that would include you

2  and assist the Court to make sure that Mr. Sepulveda appears

3  in the future, would you be willing to assist the Court with

4  those conditions?

5  A    Yes.

6  Q    Okay.  Would you be willing to report to the Court if

7  Mr. Sepulveda violates any of those conditions?

8  A    Of course.

9  Q    Okay.  And at this time, you're asking the Court to

10 consider a bond for Mr. Sepulveda?

11 A    Yes.

12 Q    Okay.  And you indicated earlier that you believe that

13 he is not a flight risk, correct?

14 A    Excuse me.

15 Q    That he's not a flight risk, he's not going to flee?

16 A    No, he's not.

17         MR. FALCON:  Pass the witness, Your Honor.

18         MS. PROFIT:  Ms. Pena, my name is Patricia Profit

19 and I represent the United States.

20              CROSS-EXAMINATION OF JULISSA PENA

21 BY MS. PROFIT:

22 Q    You indicated that you own your own house, correct?

23 A    Yes.

24 Q    And that's valued at approximately $200,000?

25 A    Yes.

1  Q    And my understanding is that you paid cash for that

2  house.

3  A    Yes.

4  Q    And how much in cash did you pay for that house?

5  A    The amount.

6  Q    $200,000?

7  A    By payments.  It took us a long time to make it -- or

8  build our house.  Took about two years.

9  Q    So it took you two years to pay approximately $200,000.

10 A    Yes.

11 Q    But the house is paid off.

12 A    Yes.

13 Q    And you also have a vehicle that's been paid off and

14 that vehicle is valued at $86,000; is that correct?

15 A    What vehicle?

16 Q    The Pretrial Services Report referred to two vehicles,

17 one which had a value of 86,000 and a second which had a

18 value of 34,000.

19 A    What vehicle is owned that is 86,000?

20 Q    That's how -- what's in the Pretrial Services Report.

21 A    I have two vehicles.

22 Q    What two vehicles do you have?

23 A    I have a white GMC Sierra 2500 and that is paid off and

24 that is not worth that much.

25 Q    And what year is that?

1   A     2011.

2   Q     Okay.  And what other vehicle do you have?

3   A     We have -- we own a 2017 Acadia.

4   Q     And that vehicle is paid off?

5   A     No, it's not.

6   Q     What is the value of that vehicle?

7   A     Approximately 40.

8   Q     And during the period of time that you were paying off

9   cash for the house at $200,000 and you were purchasing these

10  rather elaborate vehicles, is this the same period of time

11  that you were receiving $300 per month in government food

12  stamps?

13  A     Yes.

14  Q     And did you fully report that on your government food

15  stamps?

16  A     I only got food stamps this past October.  That is it.

17  Q     And for how long have you been receiving government

18  good stamps?

19  A     From November to January.

20  Q     Now a search warrant was executed at your house,

21  correct?

22  A     Yes.

23  Q     And are you aware of the fact that in the laundry

24  room -- I'm assuming that you're familiar with the laundry

25  room.

1   A    Yes.

2   Q    And in the laundry room, they found an eight ball

3   for -- which was marked "$800," which is cocaine that was

4   for sale, correct?

5   A    I'm not aware.

6   Q    So you weren't aware of the fact that the Government

7   found cocaine in a quantity for sale and distribution in

8   your laundry room.

9   A    No.

10  Q    And you're not aware that the cocaine in the laundry

11  room there also was a pistol that was next to or in close

12  proximity to that cocaine.

13  A    No.

14  Q    Now your husband does have several weapons; isn't that

15  true?

16  A    Yes.

17  Q    And, in fact, there were several shotguns, handguns,

18  et cetera that were at your property, correct?

19  A    Yes.

20  Q    Now your husband was convicted in 2005 of negligent

21  homicide; isn't that true?

22  A    Yes.

23  Q    Now according to Pretrial Services, the last time your

24  husband went to Mexico was approximately one week ago and

25  that was to attend a cousin's party; is that true?

1  A     I am not aware of that.

2  Q     So you wouldn't be aware of whatever cousin that your

3  husband might have in Mexico?

4  A     He doesn't have cousins.

5  Q     So you're saying that there's no -- that that would be

6  incorrect in terms of the Pretrial Services Report.

7  A     He does not have any relatives in the other -- in

8  Mexico.

9  Q     So then if he told -- so if he told Pretrial Services

10 that the last time he was in Mexico was a week ago to attend

11 his cousin's party that would be a lie.

12 A     I am not aware of what he said.  I am not aware of any

13 of that.

14 Q     But you're saying that to your knowledge he has no

15 cousins in Mexico.

16 A     I am certain he has no relatives on the other side.

17 Q     And the only reason that he would go to Camargo, Mexico

18 would be to dental appointments.

19 A     Yes.

20 Q     And he goes how frequently?

21 A     He hasn't gone in -- since -- past November because he

22 missed a couple of appointments, but he would go a month,

23 maybe two months.

24 Q     So it's fair to say that he's familiar with Camargo and

25 he's familiar with Mexico.

1   A     Just Camargo, which is right there.

2   Q     Now do you believe that drug traffickers are a danger

3   to the community?

4   A     I believe so.

5   Q     So that anyone who engages in drug trafficking is a

6   danger to the community.

7   A     I don't know.

8   Q     You just said that you believe that drug traffickers

9   are a danger to the community.

10  A     Yes.

11          MS. PROFIT:  No further questions, Your Honor.

12          MR. FALCON:  Nothing further, Your Honor.

13          THE COURT:  Okay.  Thank you, ma'am.

14      (Witness steps down.)

15          THE COURT:  Okay.  And, Mr. Ramirez, did -- and,

16  Mr. Falcon, that was only witness you wish to present; is

17  that correct?

18          MR. FALCON:  That is correct, Your Honor.

19          THE COURT:  Okay.  And, Mr. Ramirez?

20          MR. RAMIREZ:  Yes.  I'd like to call Deacon

21  R.C. Salinas to the stand, Your Honor.

22          THE COURT:  Okay.  Yes, sir.

23      (Witness sworn.)

24          THE COURT:  If you can just have a seat there,

25  sir?  And just be careful, there's a little step there.

1     THE WITNESS:  Thank you.

2         MR. RAMIREZ:  May I proceed, Your Honor?

3         THE COURT:  Yes, sir.

4         MR. RAMIREZ:  All right.

5     DIRECT EXAMINATION OF RODOLFO CARLOS SALINAS, JR.

6  BY MR. RAMIREZ:

7  Q    Would you please state your full name for the Court?

8  A    Rodolfo Carlos Salinas, Jr.

9  Q    Okay.  And, Mr. Salinas, when I called you to the

10 stand, I referred to you as a deacon.

11        Are you, in fact, a deacon?

12 A    Yes, I am.

13 Q    Could you tell the Court what being a deacon entails?

14 A    I'm assigned to the parish of the Sacred Heart of Jesus

15 in Escobares which includes Verosita (phonetic) and his

16 house.

17 Q    All right.  And how long have you been a deacon?

18 A    This May, it will be 41 years.

19 Q    All right.  Are you employed in any capacity right now?

20 A    No, sir.  I'm retired.

21 Q    And before you retired, what did you do for a living?

22 A    I was an educator working for the Rio Grande City

23 School District.  I was a teacher and administrator and my

24 last assignment was at the Juvenile Justice Center in Rio

25 Grande City.

1  Q    All right.  Now, Mr. Salinas, do you know Juan

2  Indalecio Garcia, the young man seated to my right?

3  A    Yes, sir, I do.

4  Q    Would you please tell the Court how you know him?

5  A    Well, I've known him since he was eight years old.

6  Q    Okay.

7  A    And I've watched him grow up.  I know his family quite

8  well.

9  Q    Can you tell the Court what -- is there a familial

10 relationship between you and the Garcias?

11 A    My daughter is married to Juan's brother.

12 Q    Okay.  And how long have they been married, if you

13 know?

14 A    Twenty-one or 22 years.

15 Q    All right.  So I think you told the Court that you've

16 known Juan -- or Mr. Juan Garcia since he was about eight

17 years old; is that correct?

18 A    Yes, sir, that is correct.

19 Q    Okay.  And are you aware of the fact that he is a

20 United States citizen?

21 A    I have no reason to doubt that.

22 Q    All right.  What type -- how would you describe Juan --

23 well, let me ask you this first: have you had occasion to

24 interact with Juan as a young boy as he was growing up?

25 A    Our families would interact quite often with Mr. Garcia

1  on family things like Christmas, Easter, et cetera, and all

2  that where everybody was together.  There was a sense of

3  family there.

4  Q    All right.  And what kind of young man was Mr. Garcia

5  when you observed him?

6  A    I always saw him as a very serious young man, very

7  serious, somewhat withdrawn --

8  Q    Okay.

9  A    -- but very pleasant and fun to be with.

10 Q    All right.  And after Mr. Garcia grew up, were you

11 aware of the fact that he married a young lady by the name

12 of Norma Villarreal?

13 A    Yes, sir, I was.

14 Q    Okay.  And are you aware of the fact that they have two

15 children together?

16 A    Yes, sir, I am.

17 Q    Okay.  And then were you also aware of the fact that he

18 went through a divorce with Ms. Villarreal and remarried

19 another young lady?

20 A    (Nods head).

21 Q    Is that a "yes"?

22 A    Yes, sir.

23 Q    Okay.  And do they have any children together?

24 A    A young boy.

25 Q    Okay.

1  A    I think he's about four years old, named XXXX.

2  Q    Okay.  Have you -- and Mr. Garcia is presently living

3  with somebody else; is that correct?

4  A    As far as I know, yes, sir.

5  Q    Okay.  Do you know the young lady that he's living with

6  now?

7  A    Just by her first name.  I don't think I ever caught on

8  to the second name.

9  Q    Okay.  And do you know whether or not they have any

10 children together?

11 A    A little girl.

12 Q    Okay.  Do you know whether or not all of his children

13 are United States citizens?

14 A    As far as I can tell, they were all born here in our

15 country.

16 Q    Okay.  Have you had occasion to see Mr. Garcia interact

17 with his family including his children?

18 A    Yes, sir, I have.  And I've always -- if I may say

19 this?  I've always been impressed by the fact that he gets

20 along very well with the four of them.  He seems --

21 Q    The four children?

22 A    The four of them.  He seems to be a very dedicated

23 father with enough time to go around.

24 Q    Okay.  I'm assuming that you don't spend a lot of time

25 with Mr. Garcia, but let me ask you this and you can answer

1  if you know: do you know whether -- how often he visits with

2  his children?

3  A    It would be hard for me to give you a precise answer,

4  Mr. Ramirez.  The only thing I could tell you is that

5  they're always together.

6  Q    You see them together a lot?

7  A    Yes.

8  Q    Okay.  Do you see them together at family functions?

9  A    At family functions primarily.

10  Q    All four of the children?

11  A    Yes, all four of them.

12  Q    Okay.  And who is the person who's usually in charge of

13  taking care of the children at the family functions that

14  you've observed, is it Mr. Garcia?

15  A    He seems to be very much in charge, sir.

16  Q    Okay.  Now are you also aware of the fact that

17  Mr. Garcia is a self-employed rancher?

18  A    Yes, I am.

19  Q    Have you ever been to any of his ranches?

20  A    Yes, I have.

21  Q    Okay.  Was his father or is his father also a rancher?

22  A    He is.

23  Q    Okay.  Has he been a rancher for decades?

24  A    For as long as I've known him when I had him in school.

25  Q    All right.  Were you also aware of the fact that

1  Mr. Garcia was -- is a collector of firearms?

2  A    I know that he likes firearms, but I'm not aware that

3  he collected them.

4  Q    Okay.  Now you and I met this morning to discuss your

5  testimony and to discuss the charges against Mr. Garcia; did

6  we not?

7  A    That is correct, sir.

8  Q    Okay.  And you understand that the charges against

9  Mr. Garcia are very serious charges; is that correct?

10 A    Yes.

11 Q    Okay.

12 A    Yes, sir, I am.

13 Q    And you and I discussed whether or not you thought that

14 because of the nature of the charges, he would be a flight

15 risk, we --

16 A    We did discuss that.

17 Q    Okay.  What is your opinion as to whether or not

18 Mr. Garcia would be a flight risk if there were conditions

19 of bond set by the Court, what is your opinion?

20 A    Mr. Ramirez, I believe that because he has his children

21 here and he is very attached to all of them and that he has

22 everything that he loves here, I don't see what he would --

23 that he would be a flight risk.

24 Q    Okay.

25 A    And who in their right mind would want to fly over to

1    Mexico?

2    Q    Okay.  Did you know that Mr. Garcia has no prior

3    convictions either misdemeanor or felony?

4    A    As far as I know.

5    Q    All right.  And as far as being a danger to the

6    community, you might have heard the question that Ms. Profit

7    asked the last witness.

8          Do you also agree that a person who deals in

9    narcotics is a danger to the community?

10   A    In general, that is correct.

11   Q    All right.  Do you have any information -- personal

12   information that Mr. Garcia has ever dealt in narcotics?

13   A    No, sir, I do not.

14   Q    Do you feel that if Mr. Garcia were released on bond

15   under whatever circumstances the Court finds necessary that

16   he would be a danger to the community?

17   A    No, sir, in no way at all.

18   Q    All right.

19          MR. RAMIREZ:  Pass the witness.

20          THE COURT:  Thank you.

21          MS. PROFIT:  Good morning.

22          THE WITNESS:  Good morning, Ms. Profit.

23      CROSS-EXAMINATION OF RODOLFO CARLOS SALINAS, JR.

24   BY MS. PROFIT:

25   Q    Now you indicated that you're familiar with the family,

1  correct?

2  A    (Nods head).

3  Q    You're nodding your head.  You're going to have to

4  speak up so that it can be recorded.

5  A    I'm sorry, Ms. Profit.  That is a "yes."

6  Q    Okay.  So then are you familiar with Salvador Garcia?

7  A    (No audible response).

8  Q    I believe that Salvador Garcia is a brother to or a

9  relationship to Amerigo Garcia?

10  A    I don't think I've ever met him, ma'am.

11  Q    Have you heard of Salvador Garcia?

12  A    I have heard of him, yes, but I don't know him.

13  Q    Okay.  But you've heard of him and his reputation in

14  the community is as a drug trafficker; is that correct?

15           MR. RAMIREZ:  Your Honor, I'm going to object.  I

16  don't believe Salvador Garcia whoever he is is before the

17  Court.

18           THE COURT:  Well, I'll just --

19           MS. PROFIT:  I believe that certain actions or

20  activities were undertaken by --

21           THE COURT:  We can just let the witness answer

22  that if he knows or not.  He can say, "No" or "Yes" if --

23  whatever his response is.

24           THE WITNESS:  With all due respect to Ms. Profit,

25  I do not know the individual.

RODOLFO CARLOS SALINAS, JR. - CROSS BY MS. PROFIT                45

1              MS. PROFIT:  Okay.

2    BY MS. PROFIT:

3    Q    So then you don't know Salvador Garcia --

4    A    No, ma'am.

5    Q    -- and you've never met Salvador Garcia.  And you're

6    unaware of the fact that there was a period of time when he

7    was a federal fugitive.

8              Are you aware of Mr. Boone LaGrange (phonetic)?

9    A    Yes, I do know Mr. LaGrange.

10   Q    And you -- so you know Mr. LaGrange.

11             And he's a property owner in Rio Grande City,

12   correct?

13   A    (Nods head).

14   Q    Is that "yes"?

15   A    That's correct.  Yes, that's correct.

16   Q    And he owns some property on the river, correct?

17   A    That is correct.

18   Q    Are you aware of the fact that Juan Indalecio Garcia

19   approached Boone LaGrange on behalf of Salvador Garcia?

20   A    How could I possibly know that?

21   Q    I'm just asking you are you aware that Juan Indalecio

22   Garcia had anything to do with Boone LaGrange?

23   A    No, ma'am, I'm not aware of that.

24             How could I possibly know that?

25   Q    Okay.  That's fine.  I'm just trying to explore.  You

1    came here, you testified to the fact that you knew Juan

2    Indalecio Garcia very well, you've known him for a number of

3    years and I believe you testified to the fact that you knew

4    his family very well.

5    A    Ms. Profit, with all due respect --

6    Q    I'm just asking you that, sir.

7    A    Okay.

8    Q    I'm just asking you is that --

9    A    Yeah, but --

10   Q    -- not what your testimony is?  This is cross-

11   examination, which means --

12   A    I understand that.

13   Q    -- that I have --

14   A    I understand what your function is.

15   Q    I don't think you do.  But at any rate --

16            THE COURT:  Ms. Profit, why don't --

17            MS. PROFIT:  At any rate --

18            THE COURT:  -- you just ask your next question?

19            MS. PROFIT:  -- what I'm trying to do is to go

20   back over certain of the representations that you made

21   before the Court and to question them.  That's my job.

22            THE WITNESS:  Would you mind repeating it?

23            MS. PROFIT:  No.

24   BY MS. PROFIT:

25   Q    I just asked you -- let's see, are you aware of the

RODOLFO CARLOS SALINAS, JR. - CROSS BY MS. PROFIT                47

1   fact that Juan Indalecio Garcia owns restaurants in Mexico?

2   A    No, I'm not.

3   Q    Are you aware of the fact that Juan Indalecio Garcia

4   has purchased a company by the name of Mister Avocado?

5   A    No, ma'am, I'm not.

6   Q    Would it surprise you to learn that he owns property in

7   Mexico?

8   A    First of all, it wouldn't be any of my business.

9   Q    Sir, have you not just represented yourself as close to

10  Mr. Juan Indalecio Garcia?

11  A    Again?

12  Q    Have you not represented yourself to be someone who is

13  close to Juan Indalecio Garcia?

14  A    In a family way, ma'am.  Let's get realistic.

15  Q    I'm just exploring how close that is.

16  A    Let's get realistic.

17  Q    So you do not know any of his business activities.

18  A    No.

19  Q    And you're unaware of any properties that he might own

20  in Mexico.

21  A    No, ma'am, I am not.

22  Q    Now are you aware of how he paid for his homestead on

23  207 Thornwood Loop?

24  A    I beg your pardon?

25  Q    Are you aware of how he obtained his homestead property

1  at 207 Thornwood Drive Loop?

2  A    No, ma'am.

3  Q    I just asked you that: are you aware of it?  Did you

4  say, "No"?

5  A    No, ma'am.

6            THE COURT:  He said, "No."

7  BY MS. PROFIT:

8  Q    Are you aware of the fact that Melissa Fernanda Orta

9  De Leon, who I believe is -- you would know her probably as

10  Melissa, you only know her first name, his current

11  girlfriend?

12  A    Yes, ma'am.

13  Q    Are you aware of the fact that she's a Mexican citizen?

14  A    Yes, I am.

15  Q    Are you aware of how frequently she travels to Mexico?

16  A    No, ma'am, I am not.

17  Q    Are you aware of how frequently Juan Indalecio Garcia

18  travels to Mexico to visit her?

19  A    No, I am not.

20  Q    Now you indicated that you understood that the charges

21  against Mr. Juan Indalecio Garcia was serious, correct?

22  A    Repeat the question.

23  Q    You indicated in response to Mr. Ramirez's testimony

24  that you understood that the charges against Mr. Juan

25  Indalecio Garcia were serious.

RODOLFO CARLOS SALINAS, JR. - CROSS BY MS. PROFIT          49

1   A    Yes, ma'am.

2   Q    Are you aware of the fact that he is facing 10 years to

3   life as a sentence?

4   A    I'm not aware of the penalty.

5   Q    So even though you are aware that they're serious, you

6   have no idea as to the penalty.

7   A    No, ma'am.  I'm not a learned lawyer.

8   Q    Okay.  So you're not aware of the fact that he is

9   facing 10 years to life.

10          THE COURT:  I think he already answered that,

11  Ms. Profit.  You don't --

12          MS. PROFIT:  No further questions for this

13  witness, Your Honor.

14          THE COURT:  Okay.  Anything else?

15          MR. RAMIREZ:  Nothing further, Judge.

16          THE COURT:  Okay.  Thank you very much, sir.

17      (Witness steps down.)

18          MR. RAMIREZ:  Judge, I'd like to call Melissa

19  Fernanda Orta De Leon to the stand.

20          THE COURT:  Okay.  Did she need the interpreter?

21          MR. RAMIREZ:  She does need an interpreter,

22  Your Honor.

23          THE COURT:  Okay.

24      (Witness sworn.)

25          THE COURT:  Okay.  You can have a seat right over

1  here, (indicating), ma'am.  And please be careful.  There's

2  a little step there.

3          MR. RAMIREZ:  May I proceed, Your Honor?

4          THE COURT:  Yes, sir.

5      DIRECT EXAMINATION OF MELISSA FERNANDA ORTA DE LEON

6          (Testimony Translated Through Interpreter)

7  BY MR. RAMIREZ:

8  Q    Would you please state your full name for the Court?

9  A    Melissa Fernanda Orta De Leon.

10 Q    Okay.  Now, Ms. De Leon, would you please move the mic

11 closer to your mouth so that we can all hear you?  Thank

12 you.

13          Ms. De Leon, how old are you?

14 A    Twenty-seven years.

15 Q    Okay.  And where do you reside?

16 A    In Rio Grande, Texas.

17 Q    Okay.  And what is the address that you're residing at

18 presently?

19 A    207 Turngood Loop.

20 Q    Okay.

21          THE COURT:  Thornwood.

22          THE INTERPRETER:  Thornwood.

23 BY MR. RAMIREZ:

24 Q    Is that Thornwood Loop?

25 A    Yes.

1   Q     Okay.  And who do you live there with?

2   A     With my daughter and with Juan.

3   Q     Okay.  And when you're referring to Juan, are you

4   referring to the gentleman seated to my right?

5   A     Yes.

6   Q     Okay.  And how long have you and Juan been together?

7   A     One year.

8   Q     Okay.  And do you have any children together?

9   A     Yes.

10  Q     And can you tell the Court the name of your child and

11  the age?

12  A     Loretta Garcia and she's one year and six months old.

13  Q     Okay.  Now, Ms. De Leon, you are not a United States

14  citizen, are you?

15  A     No.

16  Q     Okay.  Where do you reside -- where do you -- where is

17  your home country?

18  A     Monterrey, Nueva Leon, Mexico.

19  Q     Okay.  Do you have legal status to be in the United

20  States?

21  A     Yes, I do have permission.

22  Q     Okay.  And, Ms. De Leon, do you have family in

23  Monterrey?

24  A     Yes.

25  Q     Who lives in Monterrey that is related to you?

1   A     My mom and a brother.

2   Q     Okay.  And you also have a business in Monterrey.

3   A     Yes.

4   Q     What kind of business do you have?

5   A     A daycare.

6   Q     Okay.  Who runs that daycare since you are now living

7   most of the time in the United States?

8   A     My dad.

9   Q     Okay.  Is that a family business or is it your

10  business?

11  A     Family.

12  Q     All right.  Now, Ms. De Leon, is the home that you live

13  in with Mr. Garcia is that home paid for?

14  A     No.

15  Q     Are you all making monthly payments on that home?

16  A     Uh-huh.  Yes.

17  Q     Okay.  What does Mr. Garcia do for a living?

18  A     He works at the ranch.

19  Q     Okay.  And has he always been a rancher since you've

20  met him?

21  A     Uh-huh.  Yes.

22  Q     Okay.  Now do you know whether or not Juan is a United

23  States citizen?

24  A     Yes.

25  Q     Okay.  And do you -- are you aware of the fact that he

1  has lived all of his life in Rio Grande City?

2  A    Yes.

3  Q    Okay.  Now besides your daughter, you are familiar

4  with Juan's other children; is that correct?

5  A    Yes.

6  Q    Okay.  Can you tell the Court the names of his other

7  children?

8  A    Yes, sure.  XXXX XXXXXXX XXXXXXX, XX.

9  Q    Do you know his age?

10  A    Eleven years.

11  Q    Okay.  Go on.

12  A    XXXXXXX XXXXXXXX XXXXXX, 13 years.

13  Q    And the third one?

14  A    XXXXXXX XXXXXX, five years.

15  Q    Okay.  How is it that you know all of Mr. Garcia's

16  children?

17  A    Well, because ever since I've known Juan, I have known

18  the children and they go to the house and spend time with

19  him.

20  Q    Okay.  Now the older two children, those are children

21  that he had with a young lady by the name of Ms. Norma

22  Villarreal; is that correct?

23  A    Yes.

24  Q    Okay.  What is your relationship with Ms. Villarreal?

25  A    Good.

1  Q    Okay.  Do you see her children often with Juan?

2  A    Of course, every weekend.

3  Q    Okay.  Now Ms. Villarreal and Juan are divorced; is

4  that correct?

5  A    Yes.

6  Q    Okay.  And you are aware of the fact that Juan is only

7  by law entitled to see the children every other weekend?

8  A    Yes.

9  Q    Does he see them more often than he's entitled to by

10 law?

11 A    Yes.

12 Q    Is your testimony that he sees them every weekend?

13 A    Yes, each weekend and Nallely, the daughter, spends the

14 night and he takes her to school.

15 Q    Okay.  So Juan will actually take his daughter to

16 school on occasion?

17 A    Yes.

18 Q    Okay.  Does he attend functions at the school with his

19 children?

20 A    Yes.

21 Q    Okay.  As far as the third child, that child is with

22 his present wife that he has never divorced named Prisma; is

23 that correct?

24 A    Yes, correct.

25 Q    And how often does he see that child?

1   A     Same as the others, every weekend.

2   Q     Okay.  So would it be safe to say that almost every

3   weekend all four children are in your home with you and

4   Juan?

5   A     That's right.

6   Q     Okay.  What kind of father is Juan, Ms. De Leon?

7   A     To me, he's the best father.

8   Q     Okay.  Since you've been with him and known him, has he

9   been a good provider for all of the children?

10  A     Of course.

11  Q     Okay.  In fact, isn't it true that even though the

12  children are with him quite often, he continues to pay child

13  support for all the children?

14  A     That's correct.

15  Q     How much child support does he pay for the two older

16  children?

17  A     800 per month.

18  Q     And what does he pay for the third child?

19  A     Half.

20  Q     Which would be 400?

21  A     400-500, yes.

22  Q     Okay.  And this is despite the fact that he has that

23  child almost every weekend; is that correct?

24  A     Of course.

25  Q     Okay.  Now, Ms. De Leon, since you only possess an

1  immigration visa, how is it that you stay in the United

2  States for as long as you do?

3  A    I attempt -- I try to go to Mexico to Monterrey, Nueva

4  Leon every 15 or 20 days.  That's what Immigration has asked

5  of me so that I can continue to be good in their side.

6  Q    All right.  Now is there also another reason that you

7  travel to Mexico that involves your mother?

8  A    Yes.  My mom is ill with cancer and I go to visit her.

9  Q    Okay.  Now before your mom was diagnosed with cancer,

10 did she live in Mexico or in the United States?

11 A    In Monterrey part of her life and then the rest in

12 Mission here.

13 Q    Okay.  Now, Ms. De Leon, you and I reviewed the

14 Pretrial Services Report that was prepared for Judge Ormsby;

15 did we not?

16 A    Yes.

17 Q    In that Report, supposedly Juan told the Pretrial

18 Services Officer that he would travel to Monterrey two to

19 three times per month to visit you; is that a correct

20 statement?

21 A    No.

22 Q    Okay.  In fact, he doesn't have to travel to Monterrey,

23 Mexico to visit you because you are in the United States

24 much of the time; is that correct?

25 A    That's right.

1   Q    Okay.  In fact, when is the last time that you remember

2   traveling to Monterrey with Juan?

3   A    We traveled in January, this January past.  Well, we

4   did travel but we did not remain in Monterrey.  We continued

5   on to Guanajuato to fulfill an errand that took us there,

6   but we did not stay in Monterrey.

7   Q    Okay.  And before January, when was the last time that

8   you and Juan had visited Monterrey together?

9   A    December.

10  Q    Was that to see your mother?

11  A    Yes, that was to go see my mom.

12  Q    And before that, when's the last time you had been

13  there?

14  A    It was in August, the birthday of my daughter.

15  Q    Okay.  Now Ms. Profit asked the last witness whether or

16  not the witness was aware of any properties that Juan owned

17  in Mexico.

18       Are you aware of any property that Juan owns in

19  Mexico?

20  A    No.

21  Q    Okay.  If he, in fact, owned property in Mexico, do you

22  think you would be aware of it?

23  A    Sure, yes.

24  Q    Okay.  Is Juan a drug user, Ms. De Leon?

25  A    No.

1  Q     Does he consume alcohol on occasion?

2  A     Maybe.

3  Q     Okay.  Do you know whether or not he's ever been

4  convicted of either a felony or a misdemeanor as far as you

5  know?

6  A     No, never.

7  Q     Okay.  How does Juan spend his days, as far as you

8  know, where does he spend his days?

9  A     On the ranch.

10  Q     Okay.  Does he also take care of livestock that are

11  located on his father's property?

12  A     That's right.

13  Q     And where is that property located?

14  A     On Midway Road.

15  Q     Okay.  Now is that Juan's property or is that his dad's

16  property?

17  A     His dad's.

18  Q     And what livestock are kept on that property?

19  A     Cows, goats, horses and a ranch.

20  Q     Okay.  And does Juan also own a couple of small little

21  ranches besides the one that his father owns?

22  A     Yes.

23  Q     Okay.  Does he take care of just his ranches or is he

24  also in charge of taking care of his father's ranch?

25  A     Also his dad's ranch.

1   Q    Okay.  Now, Ms. De Leon, when Juan was arrested, your

2   home was searched; is that correct?

3   A    Yes.

4   Q    Okay.  Do you know what was taken from your home by the

5   agents?

6   A    (Witness answers in Spanish).

7   Q    They took one of your purses?

8   A    Yeah.  They took out his weapons, took out weapons.

9   They took jewelry, my jewelry.  They took telephones, my

10  computer, the children's computer, some money and my purse.

11  Q    Okay.  They took your whole purse?

12  A    Well, they only took one purse, the one that I had at

13  that moment.

14  Q    All right.  Do you know how much money they took from

15  your home?

16  A    I would have some idea.

17  Q    Well, what is your guess as to how much money they took

18  from your home?

19  A    Nine or $10,000.

20  Q    Okay.  Do you know what that money was for?

21  A    Juan had indicated to me that he was going to pay his

22  taxes.

23  Q    Okay.  Do you know whether or not any drugs were taken

24  from your home?

25  A    No.

MELISSA FERNANDA ORTA DE LEON - DIRECT BY MR. RAMIREZ          60

1  Q    You don't know or none were taken?

2  A    No, they took no drugs.

3  Q    Okay.  As far as the weapons are concerned, you know

4  that Juan has collected weapons for most of his adult life;

5  do you not?

6  A    Yes.

7           THE INTERPRETER:  One second.  If we don't mind,

8  if we can change it?  She can't hear out of one ear,

9  Your Honor.

10          THE COURT:  Okay.  Yes.  Thank you.

11          THE INTERPRETER:  She's been struggling a little

12 bit with it.  Thank you, Your Honor.

13      (Pause/equipment being prepared.)

14          THE COURT:  Better?

15          THE WITNESS:  Yeah, better.

16          THE COURT:  Okay.

17 BY MR. RAMIREZ:

18 Q    Now the question I asked you was: were you aware that

19 he's been collecting arms almost all of his adult life?

20 A    Yes.

21 Q    Okay.  Where does he keep those weapons?

22 A    In his closet.

23 Q    Okay.  All right.  And were those weapons -- did they

24 exist when you met him and you started living with him, did

25 he already have those weapons?

1  A     Yes, he did.

2  Q     As far as you know -- I think I've already ask this,

3  I'm sorry.

4          Now you and I discussed the burden that we have as

5  far as bond is concerned; is that correct, Ms. De Leon?

6  A     Yes.

7  Q     Okay.  We discussed the issue of risk of flight, Juan

8  being a risk of flight; you understand that?

9  A     Yes.

10 Q     Okay.  And I indicated to you, did I not, that the fact

11 that you actually are a Mexican citizen and live in Mexico

12 would probably be an issue that the Judge would consider

13 very seriously.

14 A     Yes.

15 Q     Okay.  Do you believe that Juan is a risk of flight and

16 that he would somehow run to Mexico if he were released on

17 conditions of bond?

18 A     No.

19 Q     Okay.  Tell the Court why do you believe that?

20 A     Yes.  Because the reasons for his living are all here

21 in the United States, his children, his family, his work,

22 his life and it would be for me also because I'm here with

23 him.

24 Q     Okay.  So there's no -- in other words, you can be here

25 and support him during the pendency of his trial, can you

1  not legally?

2  A    Of course.

3  Q    Okay.  Is your child a United States citizen?

4  A    Yes, my baby is a US citizen.

5  Q    Okay.  As far as a danger to the community,

6  Ms. De Leon, have you ever -- what kind of temperament does

7  Juan have?

8  A    He's a very tranquil man.

9  Q    Have you ever seen him become violent in any kind of

10  setting with your children, with you, with any of his

11  siblings?

12  A    Never.

13  Q    Okay.  Have you ever seen him use any of his weapons in

14  a menacing or an inappropriate way?

15  A    No, never.

16  Q    Okay.  The question was asked of a couple of witnesses

17  as to whether or not you believe a person who traffics in

18  drugs is a danger to the community.

19        Do you agree that that is true?

20  A    Yes.

21  Q    Have you ever observed Juan ingest or take any drugs?

22  A    No, never.

23  Q    Have you ever seen him traffic in any drugs?

24  A    No.

25  Q    Okay.  Have you ever seen any drugs in your home?

1  A    No, never.

2  Q    Were you aware of the fact that 10 years ago Juan was

3  arrested for possession of cocaine and that case was

4  dismissed?

5  A    Yes.

6  Q    Okay.  Do you think that if the Court set proper

7  conditions, that Juan would be a danger to the community?

8  A    No.

9  Q    Okay.

10        MR. RAMIREZ:  I have -- pass the witness.  I have

11  no further questions.

12        THE COURT:  Okay.  Thank you.

13        THE WITNESS:  Thank you.

14        MS. PROFIT:  Good morning or good afternoon.

15    CROSS-EXAMINATION OF MELISSA FERNANDA ORTA DE LEON

16  BY MS. PROFIT:

17  Q    You indicated that Juan is a rancher, correct?

18  A    Yes.

19  Q    And how many ranches does he own?

20  A    Ranch in itself, one.

21  Q    And where is that located?

22  A    (Witness answers in Spanish).

23  Q    Have you ever been there?

24  A    I'm not real sure of the address, but I do know where

25  it's located.

1  Q    Well, tell me where it's located.

2  A    In Rio Grande, Texas.  Rio Grande City, Texas.

3  Q    Whereabouts in Rio Grande?  That's a pretty large area.

4  A    I know that I can't really provide the address exactly,

5  but I do know about its location.

6  Q    Well, then where is the location?

7  A    In Rio Grande City.

8  Q    Could you provide a more definite location than that?

9  Have you ever been there?

10  A    Yes.

11  Q    And how did you get there?

12  A    With Juan.

13  Q    And when you were with Juan to get there, how did you

14  get there?  Where did you drive to?

15  A    Well, we went from the hospital at Rio Grande City and

16  we went straight and then we came to a traffic light and we

17  turned to the left and then to the right and then to the

18  left and we got to the door or the entryway of the ranch.

19  Q    And what kind of entryway is at the ranch, what kind of

20  gates does it have?

21  A    Well, it has kind of like a fencing and then you have

22  to get down out of the automobile to open the gate -- the

23  lock on the gate then you go through.  You get back and

24  close the gate and put the lock back on.

25  Q    When you say it has fencing, what kind of fencing does

1   it have?

2   A    Well, it's a fencing.  You have posts and then you have

3   wiring and then you have another post and some more wires

4   that make up the fence.

5   Q    Does this ranch have a name?

6   A    I'm not -- I wouldn't be able to tell you.

7   Q    So you don't know if the ranch has a name.

8            Does this ranch have a brand?

9   A    No.

10  Q    What are you answering "No" to, that the ranch does not

11  have a brand or that the ranch does not have a name?

12  A    No, it's not -- there's no name indicated.  I can't

13  tell you what the name would be.

14  Q    And do you know how many acres it is?

15  A    Approximately 1,000.

16  Q    So it's approximately 1,000 acres, but you do not know

17  if it has a name or a brand.

18  A    No.

19  Q    Is there a house on the ranch?

20  A    Yes.

21  Q    What kind of a house is there on the ranch?

22  A    Well, there's a small house, a very small house, really

23  only one main room about it.  Then it has two beds and it

24  has a bath.  Then there's another small area, a small room

25  which is the kitchen and it has a heater and a table.

1  Q     Now are you aware of Seňor Avocado?

2  A     Yes, I have heard that.

3  Q     And where have you heard that?

4  A     With Juan at home.

5  Q     And is this a business that Juan owns?

6  A     I'm not sure if he's the sole owner, proprietor but,

7  yes.

8  Q     And what is the purpose of this business?

9  A     I really am not able to tell.

10 Q     But he has a credit card in the name of Seňor Avocado,

11 correct?

12 A     I really don't know about that.

13 Q     Does he pay for your credit cards?

14 A     I don't have credit cards.

15 Q     Then you're unaware of the fact that a credit card in

16 your name was found in his wallet at the time of the search?

17 A     No.

18 Q     So you were saying that you do not have any credit

19 cards in your name.

20 A     I don't have any credit cards to my name, but I do have

21 a debit card with IBC Bank but I've -- been a long time

22 since I've used it.

23 Q     Do you know anyone by the name of -- and I'm going to

24 spell it -- O-N-E-V-A-N-I-L-L-A; do you know that name?

25 A     No.

MELISSA FERNANDA ORTA DE LEON - CROSS BY MS. PROFIT          67

1  Q    So you couldn't explain why that particular credit card

2  was in Juan's wallet.

3  A    No.

4  Q    Now you indicated that he -- when you talk in terms of

5  him traveling to Mexico, are you aware that based upon the

6  records of Homeland Security he's traveled 10 times to

7  Mexico since October of 2019; are you aware of that?

8  A    Since October 2019?  Well, maybe not of all those

9  occasions but, yes.

10 Q    So then he does travel fairly frequently to Mexico.

11 A    No.

12 Q    Now you indicated that you, in order to be in

13 compliance, have to travel to Mexico and stay in Mexico for

14 10 to 15 days, correct?

15 A    Yes, approximately so.

16 Q    And that's because you really do not have status to

17 live in the United States.

18 A    Exactly.

19 Q    Are you aware of any travel to Colombia or in Spain by

20 Juan Indalecio Garcia?

21 A    No.

22 Q    Do you know an individual by the name of Boone

23 LaGrange?

24 A    No.

25 Q    Now you indicated that you believe that drug

1  traffickers are a danger to the community.

2  A    Of course.

3  Q    Now are you aware of the fact that in many instances,

4  drug traffickers do not keep their drugs -- large quantities

5  of drugs in their homes; are you aware of that?

6  A    No.

7         MR. RAMIREZ:  Your Honor, I'm going to object to

8  that.  That calls for speculation on the part of a lay

9  witness.

10         THE COURT:  Okay.  Well, she's answered "No"

11  anyway so that's fine.

12  BY MS. PROFIT:

13  Q    But you are definitely aware of the fact that Juan

14  Indalecio Garcia is not divorced from Prisma Cantu, correct?

15  A    Of course.

16  Q    And that he continues to support her, he's purchased

17  his -- her house and all of her bills.

18  A    Yes.

19  Q    But yet you remain in a relationship with him.

20  A    Yes.

21         MS. PROFIT:  No further questions, Your Honor.

22         MR. RAMIREZ:  I just have a couple.

23         THE COURT:  Yes, sir.

24         MR. RAMIREZ:  Okay.

25      REDIRECT EXAMINATION OF MELISSA FERNANDA ORTA DE LEON

1  BY MR. RAMIREZ:

2  Q    Ms. De Leon, when we spoke about travel to Mexico, you

3  and I spoke about travel to Monterrey; did we not?

4  A    Yes.

5  Q    Okay.  And that's where you told the Court that, as far

6  as travel to Monterrey, you've only gone two or three times

7  in the last eight months.

8  A    Yes.

9  Q    Now does Juan or -- does Juan ever go to either Aleman

10  or Camargo for medicines or dental visits or doctors'

11  visits?

12  A    Perhaps.

13  Q    Would that account for the number of crossings that

14  Ms. Profit mentioned in her cross-examination?

15  A    Well, the attorney when she mentioned that, mentioned

16  Monterrey and so as far as that's concerned, it be two or

17  three or maybe four tops.

18  Q    All right.  And you are aware, are you not, that many,

19  many, many United States citizens travel to Mexico for

20  dental or doctors' visits.

21          MS. PROFIT:  Your Honor, he's asking the witness

22  to speculate.  I mean, I don't think that she's familiar

23  with the practices of many United States citizens.

24          THE COURT:  She can answer if she knows, that's

25  fine.  And I understand your point.

 1          MR. RAMIREZ:  All right.  Judge, I'll --

 2          THE COURT:  She can answer.  It's fine with me.

 3  BY MR. RAMIREZ:

 4  Q    Are you aware that many, many United States citizens

 5  along the border travel to Mexico for dental, medical,

 6  pharmaceutical needs quite often?

 7  A    Yes.

 8          MR. RAMIREZ:  No further questions, Your Honor.

 9          THE COURT:  Okay.  Thank you, ma'am.

10          THE WITNESS:  Thank you.

11      (Witness steps down.)

12          MR. RAMIREZ:  I'm going to call Norma Linda

13  Villarreal to the stand, Your Honor.

14          THE COURT:  Okay.

15

16  (Witness sworn.)

17          THE COURT:  Okay.  Ma'am, please be careful there.

18          DIRECT EXAMINATION OF NORMA LINDA VILLARREAL

19  BY MR. RAMIREZ:

20  Q    Would you please state your full name for the Court?

21  A    Norma Linda Villarreal.

22  Q    And, Ms. Villarreal, where do you live?

23  A    In Rio Grande City, Texas.

24  Q    And how long have you lived in Rio Grande City, Texas?

25  A    Forty-one years.

1  Q    Okay.  And what do you do for a living?

2  A    I am a middle school teacher.

3  Q    Okay.  What grade do you teach?

4  A    I teach sixth grade math.

5  Q    Okay.  Where do you teach?

6  A    Ringgold Middle School.

7  Q    All right.  And how long have you taught at Ringgold

8  Middle School?

9  A    Ringgold Middle School I've taught for four years.

10 I've been a teacher for like 16 years.

11 Q    Okay.  And do you know Juan Indalecio Garcia?

12 A    Yes, sir.

13 Q    And how do you know him?

14 A    He is my children's father and he's my ex-husband.

15 Q    Okay.  And you are his first wife; is that correct?

16 A    Yes, sir.

17 Q    Okay.  And the children that you and Juan have

18 together, what are their names and ages?

19 A    Nallely Garcia and she's 14 and Juan Indalecio Garcia,

20 Jr. and he's 10.

21 Q    Okay.  How long were you married to Juan Garcia?

22 A    I would say about five-six years.

23 Q    Okay.  And did you know him and were you with him even

24 before you married him?

25 A    Yes, sir.

1  Q    Okay.  Do you remember when you divorced Juan?

2  A    It's been about 12 years.

3  Q    Okay.  What is your relationship with Juan now?

4  A    We have a close relationship because of my children.

5  Q    Okay.

6  A    He helps me with my daughter.  It's very hard for me to

7  take her to practice early in the morning since I have to be

8  at work early so he takes her to practice every morning,

9  track practice, cross country practice.

10 Q    Okay.

11 A    So he helps me in that way.  And when I can't attend

12 school functions for my children, he takes the place.  He's

13 always at my school functions for the children and as far as

14 I know, he's a responsible father.

15 Q    Okay.  And how often are the children with Juan, as far

16 as visiting in his home?

17 A    Whenever they want to go.  Usually every weekend and

18 even during the week.

19 Q    Okay.  And you let them go --

20 A    It's just a matter of them saying, "I want to go to

21 Dad's," and they go.

22 Q    Okay.  And you are aware of the fact that he is living

23 with the young lady that just testified?

24 A    Yes, sir.

25 Q    And do you know her?

1   A    Yes, sir.

2   Q    Okay.  And do you trust your children with her?

3   A    Yes, sir.

4   Q    Okay.  She also has a baby with Juan; is that correct?

5   A    Yes, sir.  Uh-huh.

6   Q    And there's also another child that Juan has with the

7   lady he's currently married to; is that correct?

8   A    Yes, sir.

9   Q    Do you know all four of the children?

10  A    Yes, sir.  Uh-huh.

11  Q    Okay.  And do all four of the children spend time

12  together with Juan?

13  A    Yes.

14  Q    How much time do they spend -- you said your children

15  go whenever they want.

16  A    Yes.

17  Q    How often do you see the other children there?

18  A    Well, when he drops off my children, the small one,

19  Diel is usually with him too and Loretta is usually with him

20  too so they're always together.

21  Q    Okay.  So Juan -- would it be safe to say Juan has a

22  very close relationship with his kids?

23  A    Yes, sir.  Uh-huh.

24  Q    Are they all United States citizens?

25  A    Yes, sir.

1    Q    Now in spite of the fact that Juan spends a lot of time

2    with them, has he complied with court-ordered child support?

3    A    Yes, sir.  Uh-huh.

4    Q    Is he current today?

5    A    Yes, sir.

6    Q    And has he complied with child support since you were

7    divorced?

8    A    Yes, sir.

9    Q    Okay.  Now you have known Juan as far as that kind of

10   relationship for longer than anybody else; is that correct?

11   A    Yes, correct.

12   Q    How long has Juan been collecting firearms?

13   A    Since I met him.

14   Q    Okay.  And how old was he when you met him?

15   A    He was 16 and --

16   Q    Okay.  And did his father have a ranch?

17   A    Yes, sir.

18   Q    Is it a large ranch?

19   A    It's a large ranch.  Uh-huh.

20   Q    Do you know how large?

21   A    I really don't know.

22   Q    Okay.  And what does Juan do for a living?

23   A    Since I've known him, a rancher.  He's worked at the

24   ranch --

25   Q    Does he work on --

NORMA LINDA VILLARREAL - DIRECT BY MR. RAMIREZ                75

```
1   A    -- big bales and he has --

2   Q    Okay.

3   A    -- he's got cows and stuff that he does at the ranch.

4   Q    Okay.  Does he -- is he a caretaker for your father --

5   for his father's ranch?

6   A    Yes, sir.

7   Q    Okay.  And does -- has he also acquired smaller ranches

8   of his own?

9   A    I don't know that.

10  Q    Okay.

11  A    I wouldn't know.

12  Q    He didn't have smaller ranches when you were with him.

13  A    No, sir.

14  Q    Okay.  But he's always been a rancher since you've

15  known him.

16  A    Yes, sir.

17  Q    All right.  Now are you aware of any businesses that

18  Juan has in Mexico?

19  A    No, sir.

20  Q    Okay.  You are aware of the fact that his present

21  significant other is a Mexican citizen.

22  A    Yes, sir.  Uh-huh.

23  Q    Okay.  But you are also aware of the fact that she

24  spends a lot of time legally in the United States.

25  A    Yes.
```

1  Q    Okay.  As far as the child that he has with Prisma --

2  and what is Prisma's last name; do you know?

3  A    Cantu.

4  Q    Cantu.  Do you know whether or not Juan pays child

5  support for that child?

6  A    I wouldn't know.

7  Q    Okay.  Now since you've known Juan, Ms. Villarreal, has

8  he ever been a drug user?

9  A    No, sir.

10  Q    Okay.  Does he consume alcohol on occasion?

11  A    I wouldn't know now --

12  Q    Did he --

13  A    -- but at family gatherings, I guess, maybe football

14  games, I don't know, just casual drinking maybe.

15  Q    All right.  Do you still attend family gatherings or

16  has that stopped?

17  A    Once in a while, yes.

18  Q    You will?

19  A    Yes.

20  Q    Okay.  With his family?

21  A    Yes, with his family.

22  Q    Okay.  And have you observed him interact with all his

23  kids?

24  A    Yes, sir.

25  Q    And what kind of father is he?

1   A     To me, there's nothing, you know, that I can't ask, you

2   know, for him to help me with the children that he won't

3   say, "No," to.  Like I said, as far as my daughter, he helps

4   me with that because it's very hard for me to take her

5   practice so he takes her to practice every morning.  By

6   6:30-7:00 o'clock he has her at school.  When I can't pick

7   her up from school, when I can't pick up my son from school,

8   he's there to pick them up.

9   Q     So would you agree with me that he has an extremely

10  close bond with --

11  A     Yes, sir.

12  Q     -- all his children?

13  A     Yes, sir.

14  Q     Do you believe that there is any way in the world that

15  Juan would flee the country rather than face these charges

16  and leave his children behind him?

17  A     No, sir.

18  Q     Is there any way?

19  A     No, sir, not with the closeness he has with his

20  children.

21  Q     Okay.  As far as you know, does he own any properties

22  that he could go to in Mexico?

23  A     No, sir, not that I know of.

24  Q     Okay.  You and I and the other witnesses spoke this

25  morning concerning this hearing; is that correct?

1  A    Yes, correct.

2  Q    And you are aware of the fact that his current

3  significant other has said that she will stay as long as she

4  can legally stay to stand by his side.

5  A    Yes, sir, that's what she said.

6  Q    Okay.  So you don't believe he's a risk of flight, do

7  you?

8  A    No, sir.  I believe he's a responsible father and I

9  believe that he's responsible enough with my children, he'll

10 be responsible with this also.

11 Q    Okay.  Is Juan the type of person who tries to confront

12 his problems head on and resolve those problems?

13 A    Yes, sir.  Uh-huh.

14 Q    Okay.  As far as a danger to the community is

15 concerned, is Juan a violent person?

16 A    No, sir.

17 Q    Have you ever seen Juan become violent?

18 A    No, sir, never.

19 Q    Have you ever seen him use firearms inappropriately?

20 A    No, sir, never.

21 Q    Okay.  Have you ever seen him deal in drugs?

22 A    No, sir.

23 Q    Okay.  Have you ever seen him in possession of any

24 drugs?

25 A    No.

1  Q    Okay.  Now do you believe that Juan having a credit

2  card with somebody else's name on it makes him a danger to

3  the community?

4  A    No, sir.

5  Q    Can you --

6  A    Not at all.

7        MS. PROFIT:  Your Honor, I'm going to object.

8  Asking to speculate.  She doesn't know the circumstances.

9        THE COURT:  Okay.  She's answered already,

10 Ms. Profit.

11       MR. RAMIREZ:  Okay.

12 BY MR. RAMIREZ:

13 Q    Do you believe that somehow there's something wrong

14 with Juan having approximately $9,000 in his home to pay

15 taxes?

16 A    No, sir.  I believe you can have up to 10,000 --

17 Q    Okay.  Well, I think that's when --

18 A    -- without claiming, I believe.

19 Q    I think that's when you cross the border.

20 A    Oh.  Well, I believe -- I don't think so.

21 Q    Okay.

22       THE COURT:  And, Mr. Ramirez, on things like that,

23 I mean, what she thinks about it is probably not that

24 relevant.

25       MR. RAMIREZ:  I understand, Juan.  I'll move on.

1  BY MR. RAMIREZ:

2  Q    Do you think -- based on your knowledge of Juan and the

3  fact that you have two children with him and the fact that

4  you still know him, do you --

5          MS. PROFIT:  Your Honor, I'm going to object.  I

6  mean, the fact that she has two children with him doesn't

7  necessarily mean that she knows him.  We know where he's

8  going with this --

9          THE COURT:  Well, why don't we just let him --

10         MS. PROFIT:  -- and it's kind of self-serving.

11         THE COURT:  -- finish the question and then you

12  can cross-examine.

13         You can go ahead, Mr. Ramirez.

14  BY MR. RAMIREZ:

15  Q    Do you think that he would make all his court

16  appearances?

17  A    Yes, sir.

18  Q    Okay.

19         MR. RAMIREZ:  I have no further questions.  Thank

20  you.

21         THE COURT:  Okay.

22         CROSS-EXAMINATION OF NORMA LINDA VILLARREAL

23  BY MS. PROFIT:

24  Q    Was Juan Indalecio Garcia faithful to you?

25  A    Excuse me?

1  Q    Was Juan Indalecio Garcia faithful to you?

2  A    I don't see why that would be relevant.

3  Q    I'm just asking you that because you claim to know him.

4  A    If he was faithful to me?

5  Q    Yes.

6  A    Yes, he was faithful.

7  Q    Okay.  So that meant that there were no other women in

8  his life.

9  A    Not that I recollect.

10         THE COURT:  I don't think we need to go into this

11 any further, Ms. Profit.

12         MS. PROFIT:  I do -- Your Honor, the issue becomes

13 one of trust and she's saying that she trusts him whatever,

14 but at any rate --

15         THE COURT:  Let's just leave it right --

16 BY MS. PROFIT:

17 Q    Where do you live?

18 A    In Rio Grande City.

19 Q    And what is your address?

20 A    1821 Quito Avenue.

21 Q    And what kind of a residence is that?

22 A    A home residence.

23 Q    And do you own the home?

24 A    Yes, ma'am.

25 Q    And was the home paid for by Juan Indalecio Garcia?

1  A    No, ma'am.

2  Q    So you paid for the house yourself?

3  A    Well, I've giving payments on it, yes, ma'am.

4  Q    And did he help you with any of the payments for the

5  house?

6  A    He might have helped a couple of times but --

7  Q    If he helped you, how much did he help you towards?

8  A    Maybe a payment of four or $500.

9  Q    And did he help you with any of your other bills?

10  A    No, ma'am.  I work.

11  Q    I didn't say that you didn't work.  I just was asking

12  whether he --

13  A    Well, I can pay my own bills because I work.

14  Q    I was just asking whether he helped you with that.

15  A    No, ma'am.

16  Q    You indicated that he paid your child support.

17  A    No, ma'am, he does not pay my bills.

18  Q    And so he hasn't given you any other gifts other than

19  the child support.

20  A    No, ma'am.

21  Q    Okay.

22  A    Nothing, just child support.

23  Q    So if someone were to have told us that you received

24  other gifts from Juan Indalecio Garcia --

25  A    It would be a lie.

1  Q     Okay.  Just checking.

2  A     I've been divorced for 12 years so I don't have

3  anything that he would give me or anything.

4  Q     Now when he was married to you, did he have the

5  1000-acre ranch?

6  A     It was his father's.

7  Q     So the 1000-acre --

8  A     I don't know exactly how many acres, but I know that

9  his father owns a big ranch.

10 Q     And do you know where that is?

11 A     Not the exact point but, yes, I know where it is.

12 Q     Could you describe it?

13 A     It's down 755 and I believe you go down Segundo Ranch

14 -- Segundo Road, I think, and then other than that, I don't

15 remember.  I have not been to that ranch in many, many

16 years.

17 Q     And that's in addition to the property that's on

18 Midway, correct?

19 A     I don't --

20 Q     My understanding is that Amerigo Garcia lives on

21 Midway; is that correct?

22 A     Yes.  His father.

23 Q     And that's his father.

24 A     Yes.

25 Q     And that he has ranch property on Midway; is that your

1  understanding?

2  A    Yes, ma'am.

3  Q    But in addition to that, there's a larger property

4  that's off, as you said, I think El Segundo Road?

5  A    Which is the father's --

6  Q    You said that's how you remember --

7  A    Which is the father's ranch.

8  Q    But that's actually the father's --

9  A    And I believe the father owns that property, was given

10 to him by inheritance so.

11 Q    Do you know Salvador Garcia?

12 A    No, ma'am.

13 Q    Isn't Salvador Garcia Amerigo Garcia -- related to

14 Amerigo Garcia?

15 A    I don't know.  I wouldn't know.

16 Q    Okay.  Now do you and your children ever go to Mexico?

17 A    No, ma'am.

18 Q    But it's not that unusual for people to travel to

19 Mexico.

20 A    No, ma'am, no.  The doctor is very expensive here in

21 the United States.  Sometimes we do travel to Mexico to buy

22 medication or to take our children to the doctor since it's

23 cheaper especially me being a single mother, it's not a bad

24 idea to take them to Mexico to the doctor.

25 Q    So it wouldn't be very difficult if Juan Indalecio

1  Garcia went to Mexico for you to visit him there with the

2  children, correct?

3  A    Excuse me, say again?

4  Q    It would not be very difficult if Juan Indalecio Garcia

5  fled --

6  A    Well, if he --

7  Q    -- to Mexico for you and your children to visit him in

8  Mexico, correct?

9  A    No, ma'am, I wouldn't go especially with all the

10 violence in Mexico, I would not allow --

11 Q    But you just said that you --

12 A    -- my children to go to Mexico.

13 Q    You just said that there's a lot of times that you'd go

14 to Mexico.

15 A    To the border, yes.  If they have to go to the doctor,

16 yes, ma'am.  But I would --

17        MS. PROFIT:  No further questions, Your Honor.

18 A    -- not allow for something like that.

19        MS. PROFIT:  Your Honor, no further questions of

20 this witness.

21        THE COURT:  Anything else?

22        MR. RAMIREZ:  No further questions, Juan.

23        THE COURT:  Okay.  Thank you, ma'am.

24        THE WITNESS:  Thank you.

25      (Witness steps down.)

1        MR. RAMIREZ:  I have no further witnesses,

2  Your Honor.

3        THE COURT:  Okay.  So it's 12:30 and I'm thinking

4  it's going to take a little while as far as the evidence

5  presented by the Government and any examination by the

6  Defendants so I think we'll go ahead and take a break for

7  lunch.

8        And, Mr. Ramirez, on a totally different issue

9  just so I can -- for planning purposes this afternoon, there

10 was an issue as far as a conflict in another case.

11       Is that hearing going to proceed or do you know?

12       MR. RAMIREZ:  Judge, I spoke to Ms. Profit about

13 it.

14       THE COURT:  Okay.

15       MR. RAMIREZ:  I spoke to the family and

16 Ralph Martinez is supposed to be down here to handle that

17 hearing this afternoon.

18       THE COURT:  Okay.

19       MR. RAMIREZ:  I don't know if he's subbing in for

20 me or whether he's just going to handle it.

21       THE COURT:  Okay.  I was just wondering whether we

22 were likely to go forward.  It sounds like we probably -- we

23 may have that hearing so that's fine.

24       MR. RAMIREZ:  Yes, sir.

25       THE COURT:  So if we plan to start up again at

1    let's say 1:45?  And give everybody a little bit more than

2    an hour and we'll go ahead and recess until then.

3            Thank you.

4        (Audio ends at 12:28 p.m.)

5                        * * * * *

6            *I certify that the foregoing is a correct*

7    *transcript to the best of my ability produced from the*

8    *electronic sound recording of the proceedings in the above-*

9    *entitled matter.*

10   */S/ MARY D. HENRY*

11   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

12   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

13   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

14   *JTT TRANSCRIPT #61732 PARTIAL*

15   *DATE FILED:  FEBRUARY 27, 2020*

16

17

18

19

20

21

22

23

24

25