UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

UNITED STATES OF AMERICA,     )    CASE NO: 7:20-CR-00240
          )
          Plaintiff,     )     CRIMINAL
          )
    vs.         )     McAllen, Texas
          )
DANIEL SEPULVEDA,       )  Thursday, February 13, 2020
EVARISTO SEPULVEDA, III,    )
JUAN INDALECIO GARCIA,     )  (10:14 a.m. to 11:32 a.m.)
          )
        Defendants.   )

TESTIMONY OF SPECIAL AGENT CHRISTOPHER DONAHUE

BEFORE THE HONORABLE PETER E. ORMSBY,
UNITED STATES MAGISTRATE JUDGE

**APPEARANCES:**        See next page

Court Interpreter:     Priscilla Muzzo-Pastor

Court Recorder [ECRO]:  David Rodriguez

Transcribed By:       Exceptional Reporting Services, Inc.
                P.O. Box 8365
                Corpus Christi, Texas 78468
                361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>APPEARANCES FOR</u>:


Plaintiff:                    PAT PROFIT, ESQ.
                              Assistant United States Attorney
                              1701 W. Business Hwy. 83
                              Suite 600
                              McAllen, TX 78501

Daniel Sepulveda:             DANIEL A. SANCHEZ, ESQ.
                              501 E. Tyler
                              Harlingen, TX 78550

Evaristo Sepulveda, III: GILBERTO FALCON, ESQ.
                              404 N. Britton Ave.
                              Rio Grande, TX 78582

Juan Garcia:                  GOCHA A. RAMIREZ, ESQ.
                              515 E. Second Street
                              Rio Grande City, TX 78582

3

## INDEX

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CHRISTOPHER DONAHUE | | | | |
| BY MS. PROFIT | 5 | | 59 | |
| BY MR. SANCHEZ | | 21 | | 62 |
| BY MR. FALCON | | 32 | | 63 |
| BY MR. RAMIREZ | | 43 | | 66 |

1    __McAllen, Texas; Thursday, February 13, 2020; 10:14 a.m.__

2                    **(Call to Order)**

3          **THE COURT:**  Okay, so I want to turn back to the case

4    we were proceeding on the other day when the power went out.

5    Hopefully, it will stay on here today.

6              This is Criminal Case Number M-20-240; United States

7    versus Daniel Sepulveda.

8              If you could please come forward.  And you can just

9    have a seat at Counsel table with your attorney as we continue

10   the hearing.

11             And then also, on the same case, Evaristo Sepulveda,

12   III, and Juan Indalecio Garcia.

13             Let's see.  Right.  Just so Sepulvedas are sitting

14   next to their attorney, it sounds probably fine.  Thank you.

15             Okay, so we're at the point the Government was going

16   to present some evidence.

17             Ms. Profit?

18         **MS. PROFIT:**  Yes.  The Government calls Special Agent

19   Christopher Donahue, your Honor.

20         **THE COURT:**  Okay, come forward, sir.

21         **THE CLERK:**  Please raise your right hand.

22    **SPECIAL AGENT CHRISTOPHER DONAHUE, GOVERNMENT'S WITNESS, SWORN**

23   *//*

24   *//*

25   *//*

1                          **DIRECT EXAMINATION**

2    **BY MS. PROFIT:**

3    Q    Could you state your name for the record?

4    A    Christopher Donahue.

5    Q    And where are you employed?

6    A    The Drug Enforcement Administration, in McAllen, Texas.

7    Q    And how long have you been with the Drug Enforcement

8    Administration?

9    A    Approximately four and a half years.

10   Q    And has it always been in McAllen, Texas?

11   A    Yes, ma'am.

12   Q    Now, are you involved in the investigation of Daniel

13   Sepulveda, Evaristo Sepulveda, and Juan Indalecio Garcia?

14   A    I am.

15   Q    And that's part of a larger drug trafficking organization,

16   correct?

17   A    Correct, ma'am.

18   Q    Could you identify, for the record, Daniel Sepulveda?

19   A    Daniel Sepulveda is sitting at the Defense Counsel table.

20   He's wearing a green jacket.

21        **MS. PROFIT:**  Would the record reflect he's identified

22   the Defendant Daniel Sepulveda.

23        **THE COURT:**  Yes.

24   //

25   //

Donahue - Direct / By Ms. Profit                    6

1   **BY MS. PROFIT:**

2   Q    Could you identify, for the record, Evaristo Sepulveda?

3   A    Evaristo Sepulveda is sitting at Defense Counsel table.

4   He's wearing a gray-colored sweatshirt.

5          **MS. PROFIT:**  Would the record reflect he's identified

6   the Defendant Evaristo Sepulveda?

7          **THE COURT:**  Yes, it will.

8   **BY MS. PROFIT:**

9   Q    And could you identify the Defendant Juan Indalecio

10  Garcia?

11  A    Yes.  Juan Garcia is sitting at Defense Counsel table,

12  wearing a green-colored camouflage sweatshirt.

13         **MS. PROFIT:**  Would the record reflect he's identified

14  the Defendant Juan Indalecio Garcia?

15         **THE COURT:**  Yes, it will.

16  **BY MS. PROFIT:**

17  Q    Could you explain, for purposes of this detention hearing,

18  the -- the Defendants are charged with a smuggling -- with

19  smuggling 320 kilograms of cocaine, correct?

20  A    Yes.

21  Q    And could you identify the weight of the evidence as to

22  each of these Defendants?

23         For example, Daniel Sepulveda, what was his role?

24  A    So Daniel Sepulveda was identified as the driver of the

25  ATV that was transporting the 320 -- approximately 320

1    kilograms of cocaine.

2    Q    And what did he do -- at some point in time, did he flee

3    to Mexico?

4    A    Yeah.  So following the failed smuggling attempt, my

5    agents observed Daniel Sepulveda drive the vehicle back towards

6    the Rio Grande River.  They observed him crash down into the

7    river and then swim back into Mexico.

8    Q    And what was Evaristo Sepulveda's role in this?

9    A    So Evaristo Sepulveda was observed at 208 Midway Road.

10            Prior to the agents getting dropped off south of 208

11   Midway Road --

12   Q    And when you say, "the agents," you're talking in terms of

13   border patrol agents?

14   A    Yes.  The two border patrol agents that were involved in

15   the seizure, ma'am.

16            So Evaristo was observed prior to the smuggling

17   event.  And then immediately after the smuggling event, he was

18   observed leaving the residence and getting into a vehicle and

19   then driving to a barn approximately 30 yards away.

20            And then he was observed with a bag in his hand,

21   attempting to feed horses.  That's what he told the border

22   patrol agent.

23   Q    Now, he was -- he -- in terms of where Evaristo was, was

24   there a bundle of cocaine that was found in close proximity to

25   where Evaristo Sepulveda was?

1  A    Yes.  Where he was standing during the smuggling attempt,

2  he was approximately five to ten yards from the bundle of

3  cocaine.

4            And Juan Garcia was also in the same area, standing

5  right next to Evaristo Sepulveda, approximately five to ten

6  yards from a bundle of cocaine.

7  Q    And if I remember correctly, were these individuals

8  attempting to feed the horses deer corn?  Am I remembering that

9  correctly?

10 A    No.  The border patrol agent that encountered both

11 Evaristo Sepulveda and Juan Garcia, he wasn't able to tell what

12 kind of -- what was in the bag.

13           It just appeared to be a bag of corn.

14 Q    And, now, in terms of these individuals -- so in terms of

15 the 320 kilograms of cocaine, when we talk in terms of the

16 weight of the evidence, we're talking in terms of observations

17 by border patrol agents, correct?

18 A    Correct, ma'am.

19 Q    And in addition to that, do we have any information from

20 cooperating individuals?

21 A    Yes, ma'am.  So we spoke to multiple sources of

22 information and cooperators that stated that Daniel Sepulveda

23 was involved in the 320 kilograms of cocaine that was seized by

24 border patrol agents.

25 Q    And with respect to the other individuals, have they also

Donahue - Direct / By Ms. Profit                    9

1   been identified by cooperating individuals?

2   A     Yes.

3   Q     And this is more than one cooperating individual?

4   A     Yes.

5   Q     Now, in addition to that, we've executed search warrants.

6         Have we retrieved certain information from various

7   phones identified as belonging to these individuals?

8   A     Yes.  So, on August 30, 2019, DEA, U.S. Border Patrol, and

9   Texas DPS executed a search warrant at Daniel Sepulveda's

10  residence, at 25 Midway Road.

11        During a search of that residence, we recovered one

12  cell phone -- or we actually recovered multiple cell phones

13  from Daniel Sepulveda's person.

14        In one of those phones, agents recovered text

15  messages between Daniel Sepulveda and Daniel Sepulveda's wife,

16  Ariana Sepulveda, on January 17th and January 18th, describing

17  a cocaine smuggling attempt.

18  Q     And have we identified -- have we also seized cell phones

19  containing text messages that discuss other cocaine smuggling

20  attempts other than the ones involving -- other than the 320

21  kilograms of cocaine?

22  A     Correct, ma'am.  So in that same phone, there were several

23  messages between Daniel Sepulveda and Juan Garcia.

24        Juan Garcia was identified, in the text message from

25  between Daniel Sepulveda and Juan Garcia.  A picture of Juan

Donahue - Direct / By Ms. Profit                    10

1    Garcia is sent in the -- in the text message stream as well as

2    Juan Garcia's address.

3              In those text messages, agents identified

4    approximately ten suspected cocaine loads that were crossed

5    across Rio Grande River and into the Midway Road area, Rio

6    Grande -- Rio Grande City, Texas.

7    Q    And this would involve Daniel Sepulveda and Juan Garcia?

8    A    Yes, ma'am.

9    Q    Now, in addition to these cocaine smuggling attempts that

10   are detailed in the cell phone records, in the text messages --

11   in addition to that, do we have any linkages to them to the

12   seizure of $1,487,005 at 32 Midway Road?

13   A    Yes.  So on July 2, 2019, U.S. Border Patrol agents and

14   Texas DPS troopers seized $1,487,005 from the -- the riverbank

15   area, on the Rio Grande River.

16             Daniel Sepulveda and Evaristo Sepulveda's cousins,

17   Manuel Sepulveda, was subsequently arrested in that currency

18   smuggling attempt.

19             Prior to, during, and afterwards, the smuggling

20   attempt agents observed an unusual amount of activity at the

21   parents' residence of Daniel and Evaristo Sepulveda.

22             Because of the amount of activity that was observed

23   at this residence, agents subsequently did a consensual

24   encounter at the residence and encountered Daniel Sepulveda and

25   Evaristo Sepulveda at that residence.

Donahue - Direct / By Ms. Profit                    11

1   Q    Now, when we -- a search warrant was conducted at Daniel

2   Sepulveda's residence on August 30, 2019.

3                How much cash was seized from that residence at that

4   time?

5   A    I believe it was a little bit more than $83,000.

6   Q    And was there anything significant about the packaging of

7   that?

8   A    The majority of the money was wrapped in Saran Wrap.  It

9   was packaged like bulk drug proceeds and was hidden in a

10  drawer.  Another large amount of money was in a backpack.  And

11  it was bundled with rubber bands.

12  Q    Now, at that time, did Daniel Sepulveda make any remarks

13  with respect to pole cameras?

14  A    Yes.  Towards the end of the search warrant, when I was

15  going over the items seized from the residence, in front of him

16  and his brother, Daniel Sepulveda made several remarks about

17  pole cameras that were located on Midway Road.

18                Daniel Sepulveda stated that he wanted agents to

19  take the cameras down.  He stated that he knew they were DEA

20  cameras.  We (indisc.) someone at the electric company, and

21  they told him that they were specifically DEA cameras.

22                And then his brother stated that it was against

23  their Constitutional rights to have law enforcement cameras on

24  Midway Road in the area of their -- their houses.

25  Q    And did anything subsequently happen to that -- those pole

1   cameras?

2   A     Yes.  On that same evening, our pole cameras were shot out

3   and rendered inoperable.

4   Q     And prior to their being rendered inoperable, was there

5   any observations with respect to Daniel Sepulveda?

6   A     Yes.  Agents conducting surveillance at Jose Luis'

7   secondary residence, at 39 Alegria Circle.

8           They observed Jose Luis Garcia show up to that

9   residence; they observed Daniel Sepulveda and Rene Sepulveda

10  show up to that residence.

11          Shortly after, they observed Jose Luis Garcia exit

12  the residence with a rifle case.  This same ice -- rifle case

13  was observed on that same day, during a search warrant at that

14  residence, containing a firearm.

15          They observed Jose Luis Garcia get into his vehicle

16  with the rifle case.  They observed everybody leave the

17  residence, including Daniel Sepulveda and Rene Sepulveda.

18          Approximately one hour later, our pole cameras were

19  rendered inoperable.

20  Q     And when you say that they were rendered inoperable, have

21  you -- have the pole cameras subsequently been examined and an

22  determination made as to why they were inoperable?

23  A     Yes.  There is a pole cam -- pole camera located on a

24  pole -- electric pole maybe approximately 100 yards from Daniel

25  Sepulveda and Evaristo Sepulveda's residence.

Donahue - Direct / By Ms. Profit                    13

1        Texas DPS rangers went out following the pole

2  cameras being shot.  They conducted a trajectory investigation

3  and determined that that one specific camera was shot from 32

4  Midway Road, which is the residence of Daniel Sepulveda and

5  Evaristo Sepulveda's parents' house.

6  Q    And what about -- do they make -- were they able to make

7  any determination with respect to the other pole camera?

8  A    I don't have that information with me now.

9  Q    Okay, so in addition to that, does Daniel Sepulveda have

10 any *corridos*?

11 A    Yes.  Doing a search of Daniel Sepulveda's phone, agents

12 discovered two phones -- or two songs that appeared to be

13 written about Daniel Sepulveda and narco-trafficking -- or drug

14 trafficking.

15 Q    An d when you say, "narco-trafficking," could you explain,

16 please, what the purpose of a *corrido* is?

17 A    Well, in drug trafficking songs -- specifically with

18 Mexican drug cartels -- the drug traffickers like to have songs

19 written about them.

20 Q    And is this -- the purpose of these songs just sort of

21 celebrate how they -- to how great they are in terms of their

22 drug trafficking?

23 A    Yes.  Usually songs describe violence; they describe

24 kidnappings; they describe successful narcotic smuggling

25 attempts; they describe a lot of currency that they make

1    regarding their narcotics trafficking.

2    Q    Now, in terms of Daniel Sepulveda's *corridos*, did he

3    identify any individuals that are investigating him -- in his

4    *corrido*?

5    A    Yes.  My partners listened to the songs and they

6    identified several events that appear to be depicting Daniel

7    Sepulveda and U.S. Border Patrol.

8    Q    And any specific U.S. Border Patrol individuals?

9    A    Yes.  One individual -- they describe white law

10   enforcement officers.

11   Q    Okay, now, in addition to that, during -- when Daniel

12   Sepulveda was arrested, did he make any threats or make any

13   statements with respect to law enforcement?

14   A    Yes.  So when Daniel Sepulveda was being transferred -- or

15   transported from the area of his residence, after he was

16   arrested, to the DEA office, he made a statement stating that,

17   "I have ten guys over that hill."

18            So the agents related to me that they believed that

19   he was insinuating that he had other -- he had other people

20   that could possibly stop law enforcement from transporting him.

21   Q    Did he make any other statements with respect to when you

22   made entrance into his property -- what he thought he would

23   have been able to do?

24   A    Yeah.  So at the DEA office, in McAllen, he made a

25   statement saying that agents were lucky, that if he got one of

1   his rifles, he would have least shot two agents.

2            He stated that he wasn't afraid to die, and he would

3   at least kill two agents.

4   Q   Now, did he also brag to the agents with respect to how

5   many vehicles he had or how he attempts to evade law

6   enforcement?

7   A   Yes.  Daniel Sepulveda stated to my partners that he had

8   access to approximately 40 vehicles on a daily basis.

9            He stated that he utilizes at least five different

10  vehicles or more on a daily basis in order to avoid law

11  enforcement detection.

12  Q   And is this something -- these bragging statements that

13  he's made or these statements that he's made at the time -- is

14  that something consistent that law enforcement has observed?

15  A   That's correct, ma'am.

16  Q   And when you say you observed it, you've observed him

17  using more than one vehicle, correct?

18  A   Yes.  He frequent -- Daniel Sepulveda frequently changes

19  out vehicles.

20  Q   Now, in terms of Evaristo Sepulveda, what did agents find

21  in terms of narcotics when they executed the search warrant at

22  his residence, on February 5, 2020?

23  A   Yeah.  So when agents executed the search warrant at

24  Evaristo's residence, they located and seized approximately 200

25  grams of marijuana.  It was packaged like street-level

1   distribution amounts.

2          They also seized approximately 40 grams of cocaine.

3   And next to the cocaine and marijuana was a handgun.

4   Q    And were these -- were the -- was the cocaine and the

5   handgun, et cetera -- the street-level distribution, was this

6   found in a laundry room of the house?

7   A    Correct, ma'am.

8   Q    Now, and was he also, in terms of some of the

9   information -- in terms of his phone, what did his phone show

10  in terms of pictures of -- in terms of narcotics trafficking?

11  A    And so he had a lot of pictures in his phone with smaller

12  amounts of marijuana.  Then he also had numerous pictures

13  regarding marijuana bundles.  They were -- were bundled.  We

14  could tell it was marijuana.  So it was full quantities of

15  marijuana.

16          A few days prior to him getting arrested, there was

17  a photo in his phone with a kilogram of cocaine.  And Evaristo

18  Sepulveda and another subject are talking about the purchase of

19  that particular kilogram of cocaine.

20          He also had one particular video that was a drug --

21  that appears to be a drug cartel interrogation video.

22          In that video, the subject was getting his legs cut

23  off -- he was alive, getting his legs cut off.  And then he was

24  getting beat with his own legs.

25          And then in another video, it appears that a

Donahue - Direct / By Ms. Profit                    17

1   deceased subject is removed from the bed of a truck.  The two

2   individuals then take this person from the truck and dump him,

3   it looks like, in the landfill.

4   Q    Now, in terms of his phone, did you find any pictures of

5   law enforcement?

6   A    Yes.  He had numerous videos of law enforcement

7   helicopters flying in the air; he had numerous videos of law

8   enforcement traffic stops; and he had numerous pictures of --

9   it looks like he had pulled on the side of the road, taking

10  pictures of law enforcement or taking pictures down the street

11  that, in my experience, it appears to be the pictures of him

12  scouting for law enforcement.

13  Q    Now, in terms of Juan Indalecio Garcia -- the information

14  with respect to him is that he -- how frequently does he -- at

15  one point in time, you interviewed an individual by the --

16  Americo Garcia, on January 18, 2019, correct?

17  A    Yes.  Following the seizure of the 320 kilograms of

18  cocaine, on January 17, the following day, myself and my

19  partners went down to 208 Midway Road, which is the residence

20  of Juan Garcia's father, Americo Garcia.

21          I spoke to Americo Garcia that day.  He was very

22  cooperative and respectful.  During the interview with Americo

23  Garcia, he stated that he did not know what Juan Garcia did for

24  work.  He also stated he didn't know where his son lived, or he

25  didn't know what his phone number was.

Donahue - Direct / By Ms. Profit                    18

1  Q    And you consider that to be strange, considering that he's

2  his father, correct?

3  A    Yeah, I found it very strange because he's down on his

4  property a lot.

5  Q    And in addition -- so, now, in what other kinds of

6  criminal activity do we have him associated with -- Juan

7  Indalecio Garcia?

8  A    So Juan Garcia -- so when we seized Daniel Sepulveda's

9  phone, on August 30th, agents discovered approximately -- we

10 knew this conversation to be Daniel Sepulveda and Juan Garcia

11 discussing narcotics, loads crossing the Rio Grande River.

12          Agents determined between approximately June and

13 August 2019, they crossed approximately ten cocaine loads.

14 Additionally, agents had observed Juan Garcia in and around the

15 area of 208 Midway Road on numerous occasions.  And they also

16 observed him involved in suspected smuggling attempts.

17          In June of 2018, agents observed an ATV travel from

18 208 Midway Road and travel to the river.  And it subsequently

19 traveled back.  So agents -- that was a smuggling attempt where

20 agents responded.

21          This particular border patrol agent encountered Juan

22 Garcia at the residence as well as two other individuals.  On

23 this date, Juan Garcia was really uncooperative.

24          Agents discovered the two ATVs next to the house, in

25 close proximity to where Juan Garcia was standing.

Donahue - Direct / By Ms. Profit                    19

1          Agents observed, I guess, footprints next to one of

2    the ATVs.  They followed the footprints to a barn approximately

3    30 to 40 yards away from the house.  Inside the barn, they

4    found five individuals that were determined to be illegal

5    aliens.

6          In the (indisc.) close to the barn, they found and

7    apprehended another two individuals that have also been

8    determined to be illegal aliens.

9          Seven -- the seven subjects indicated that -- stated

10   to the agents that they were picked up and transported from the

11   river into the United States and taken to the house.

12         However, they could not, at the time, identify the

13   ATV that transport them or the subjects at the house.

14   Q    Now, in terms of individuals involved in this narcotics

15   trafficking organization, is there an individual that the

16   Government, at one time, had an arrest warrant for and they

17   were attempting to find and had been unable to find -- an

18   individual by the name of Joaquin Sepulveda?

19   A    That's correct, ma'am.

20   Q    And what have we subsequently learned -- or is there an

21   ongoing investigation into the disappearance of Joaquin

22   Sepulveda?

23   A    Yes.  So Joaquin Sepulveda was involved in an illegal

24   alien smuggling attempt, in July 2019.

25         The vehicle that Juan received was driving during

Donahue - Direct / By Ms. Profit                    20

1    that attempt was a Toyota Tacoma.  And that same Toyota Tacoma

2    was present at 208 Midway Road, on the 320 kilograms of cocaine

3    was at the -- at the house.

4            Following Joaquin Sepulveda, there was a vehicle

5    chase.  Agents tried to -- attempted to stop him.

6            Juan -- Joaquin Sepulveda subsequently splashed down

7    at the river, swam back into Mexico.  Agents -- border patrol

8    agents arrested two illegal aliens.

9            Shortly after that, an arrest warrant was issued for

10   Joaquin Sepulveda for transportation of illegal aliens.  Since

11   then, agents have not been able to find him.

12           However, since the smuggling event in July, agents

13   have interviewed and debriefed numerous sources that stated

14   that Juan Garcia and Daniel Sepulveda were involved in the

15   disappearance of Joaquin Sepulveda.

16   Q    Now, the disappearance of Joaquin Sepulveda is considered

17   unusual because he has a young child, correct?

18   A    Correct.

19   Q    And how old would that child be?

20   A    I believe now his young child would be maybe five or six

21   months old.

22   Q    Okay.

23       **MS. PROFIT:**  I have no further questions of this

24   agent.

25       **THE COURT:**  Okay.  And let me see.

Donahue - Cross / By Mr. Sanchez                    21

1              I guess, beginning with Mr. Sanchez, did you wish to

2       ask any questions, sir?

3              **MR. SANCHEZ:**  Yes, your Honor.

4              **THE COURT:**  Okay.

5              **MR. SANCHEZ:**  If I may.

6              **THE COURT:**  And if you'd please pull the microphone a

7       little bit closer, Mr. Sanchez.

8                              **CROSS EXAMINATION**

9       **BY MR. SANCHEZ:**

10      Q    Officer Donahue, my name is Dan Sanchez.  I'm going to be

11      asking you some questions.

12             If you don't understand my question, please let me

13      know and I'll try to clarify it for you, okay?

14      A    Understood.

15      Q    How long have you been investigating my client, Daniel

16      Sepulveda?

17      A    Daniel Sepulveda, I believe popped up in my

18      investigation -- my investigation's been going on for

19      practically three years.

20             I would say I began getting information for -- on

21      Daniel Sepulveda approximately maybe two years ago, two and a

22      half years ago.

23      Q    So for two and a half years, you've known who Daniel

24      Sepulveda is, correct?

25      A    Correct.

Donahue - Cross / By Mr. Sanchez                22

1   Q    And the event where the 320 kilograms of cocaine were

2   seized, what day was that?

3   A    It was January 17, 2019.

4   Q    Over a year ago; is that correct?

5   A    Yes.

6   Q    Okay, and you're saying that, on that day, you identified

7   my client as the driver of the ATV?

8   A    Yes, your client was identified as the driver of the ATV.

9   Q    Okay, and at that time, you knew who he was?

10  A    I don't understand the question.

11  Q    At the time that he was identified as the driver, you knew

12  who Daniel Sepulveda was?

13       **MS. PROFIT:**  Your Honor, I'm going to object to this

14  line of questioning as being argumentative.

15       **THE COURT:**  Well, I think he did already answer that,

16  Mr. Sanchez.

17       But you can go ahead and answer if you -- if you

18  know, Agent.

19       **THE WITNESS:**  Yes.  Well, I knew who he was.

20  **BY MR. SANCHEZ:**

21  Q    Okay, and at that time, you said he escaped to Mexico?

22  A    Yes.  Following the cocaine smuggling event, yes, he swam

23  back to Mexico.

24  Q    Okay, when was the next time after that that you

25  encountered Daniel Sepulveda?

Donahue - Cross / By Mr. Sanchez                      23

1   A    The next time I encountered him was probably about May

2   2019.

3   Q    And on May of 2019, did you decide to arrest him for that

4   smuggling that he had done in January of 2019?

5            **MS. PROFIT:**  Your Honor, I'm going to object to this

6   line of questioning.  It really has no relevance.

7            **THE COURT:**  Well, I understand the point he's making,

8   Ms. Profit.  And I'm just going to go ahead and allow him to

9   ask some further questions on this.

10           But I get the point you're making, Mr. Sanchez.  You

11  don't need to belabor it that -- that there was this

12  information and they waited until now to, you know, arrest your

13  client.

14           So I understand.  And you can argue that as well

15  without, you know, asking questions that -- if that's just the

16  point you're getting to.  So but that's fine.

17           I've forgotten what the last question is.  You can go

18  ahead with that last question, Mr. Sanchez.

19  **BY MR. SANCHEZ:**

20  Q    So just to clarify, there's been several points in time

21  that you've been able to, since the arrest and to the time that

22  he actually was arrested for this -- that you could have

23  arrested him throughout the last year, correct?

24  A    No.  So that's not correct.

25           It wasn't until after we started doing extensive

**EXCEPTIONAL REPORTING SERVICES, INC**

Donahue - Cross / By Mr. Sanchez                    24

1    surveillance along Midway Road -- in the area of 208 Midway

2    Road, that through the -- through the partnership with U.S.

3    Border Patrol, Texas DPS, DEA, HSI, and other agencies that

4    were helping us, we were able to identify the individuals that

5    were involved in the majority of the smuggling activity in this

6    area.

7              So over several months, we identified -- I guess you

8    could say -- the players in this particular area.

9              So sometime within the last four or five months,

10   we've shown the perpetrators that were involved in that

11   seizure; we showed them pictures.

12             And the agent that was involved in that cocaine

13   seizure identified Daniel Sepulveda as the driver of the ATV

14   that crashed in the river.  He actually observed Daniel

15   Sepulveda on three different occasions.

16   Q    Now, you talked about a million dollars that was seized

17   back in July of 2019.

18   A    Correct.

19   Q    Do you have any evidence to say that my client was ever in

20   possession or had any control over that million dollars?

21   A    So prior to the -- prior to that bulk currency smuggling

22   event, the vehicle that was involved in that smuggling event

23   stopped at 32 Midway Road -- which is the residence of Daniel

24   Sepulveda and Evaristo Sepulveda's parents.

25   Q    And that vehicle belonged to who?

Donahue - Cross / By Mr. Sanchez                    25

1   A    Manuel Sepulveda, which is a cousin of Daniel Sepulveda

2   and Evaristo Sepulveda.

3   Q    And that's the one that has a warrant for him, but you

4   can't locate him?

5   A    No.  That's a different individual.

6   Q    Okay, so Manuel Sepulveda, that was arrested for -- or

7   charged for the possession or, I guess, money laundering of the

8   over-million dollars?

9   A    Yes.  He was arrested on that day for cash smuggling.

10  Q    Okay, my client wasn't charged with that?

11  A    No.

12  Q    Okay, and the only links that you're saying he has is that

13  that truck stopped at my client's parents' home?

14  A    Yes.  It stopped at that house.  And following the bulk

15  currency smuggling event, we did a consent search of that

16  residence.

17         And inside that residence, agents recovered

18  approximately 17 portable radios that are frequently used in

19  narcotics trafficking.  They also seized wrapping material.

20  Q    In addition to that, you talked about another individual;

21  Joaquin Sepulveda, correct?

22  A    Correct.

23  Q    And he's someone who's related to my client?

24  A    I believe so.  They're cousins.

25  Q    Okay, and you're saying that my client was involved in his

Donahue - Cross / By Mr. Sanchez                    26

1    disappearance?

2    A     Yes.  Through areas of multiple (indisc.) sources of

3    information that -- this information has been proven reliable

4    on numerous instances.

5              Those individuals stated that your client, Daniel

6    Sepulveda, was involved in the kidnapping of Joaquin Sepulveda

7    in Mexico.  And it was involved in the murder of Joaquin

8    Sepulveda.

9    Q     But this is the same Joaquin Sepulveda who has criminal

10   charges pending against him?

11   A     Yes.  There's an outstanding Federal arrest warrant for

12   the transportation of illegal aliens.  And then he also has an

13   outstanding Texas State warrant for probation violation.

14   Q     So he's a fugitive from the law?

15   A     Correct.

16   Q     And because he's got a six-month old child here in the

17   U.S., that seems odd that he would run to Mexico or run away

18   and not show up?

19   A     Well, we have information that he should -- he was here

20   during the birth of his child.  But he hasn't been seen since.

21   Q     Okay, but Ms. Profit asked you that it wouldn't be

22   reasonable for someone who has a young child to flee and not

23   come back, correct?

24   A     I feel that's really odd.

25   Q     In other words, if someone has family and ties here, it's

1   not --

2           **MS. PROFIT:**  Asked and answered; argumentative.

3   **BY MR. SANCHEZ:**

4   Q    -- it's not likely that they would run, correct?

5   A    Yeah.  I think people will run, yes.

6   Q    So wouldn't it make sense, then, that Joaquin Sepulveda is

7   running from his charges that he has pending because he's a

8   fugitive?

9   A    No.  That could make sense.  But through a conversation

10  with a numerous source of information and cooperative

11  Defendants, they say that that -- he was purposely being held

12  over in Mexico and then was subsequently murdered because

13  members of the Garcia and Sepulveda families thought he had

14  been cooperating with law enforcement.

15  Q    And these same people are cooperating with the Government,

16  knowing that the reason this person was killed -- or allegedly

17  killed was because he cooperated?

18  A    I don't understand your question.

19  Q    Well, you're wanting this Court to believe that you have

20  sources -- individuals that are cooperating and have given you

21  information that Joaquin Sepulveda was killed for fear of

22  cooperation?

23  A    That's correct.

24  Q    So these individuals don't have that fear, but Joaquin

25  did?

Donahue - Cross / By Mr. Sanchez                    28

1          **MS. PROFIT:**  Your Honor, if this is asking him to

2    speculate, it's also argumentative.

3          **THE COURT:**  Right.  There's no way he could know

4    that.  I mean, he's -- you can argue those things, Mr. Sanchez,

5    also, that if you want to argue that what he's saying doesn't

6    make sense.  But to ask him questions like that, it doesn't

7    really help and --

8          **MR. SANCHEZ:**  Yes, your Honor.  I'll move along.

9    **BY MR. SANCHEZ:**

10   Q    The 40 vehicles that you said my clients used, what are

11   they?  What are the makes, models; what type of vehicles is he

12   using?

13   A    Your client, Daniel Sepulveda, told agents he had access

14   to 40 vehicles.

15          Personally, I don't know if he had 40 vehicles or

16   not.

17   Q    Okay, well, you testified that he has many vehicles,

18   different vehicles he uses.

19          Can you tell me what they are; the ones that you're

20   aware of?

21   A    No.  He has numerous vehicles.

22   Q    Which ones are they; the ones that you know of?

23   A    Well, I don't know particular makes and models off the top

24   of my head.  But I know, talking to numerous border patrol

25   agents that are constantly out there, in the area of his

1   residence, that he frequently changes his vehicles.

2   Q    But you don't know what vehicles?

3   A    Not the top -- off of my head.

4   Q    Okay, and have any of those vehicles -- they've actually

5   been observed by these law enforcement, correct?

6   A    Yes.

7   Q    Your agents?

8   A    Yeah.  My partners have observed Daniel Sepulveda driving

9   different vehicles.

10  Q    And have you-all run the license plate of those vehicles

11  to see who they belong to?

12  A    I'm sure the agents did.

13  Q    And who do they belong to?

14  A    Sometimes they involve -- Daniel Sepulveda has a lot of

15  vehicles registered to other people.

16  Q    Who are they registered to?

17  A    I don't know off the top of my head.

18  Q    Okay, do you know what vehicles --

19       **MS. PROFIT:**  You know -- your Honor, are we getting

20  into discovery?  This is a detention hearing.

21       **THE COURT:**  You asked questions, Ms. Profit.  And

22  Defense Counsel can ask questions also.

23       I think we're okay now.

24       You can go ahead and continue, Mr. Sanchez.

25       **MR. SANCHEZ:**  Thank you, your Honor.

Donahue - Cross / By Mr. Sanchez                    30

1    **BY MR. SANCHEZ:**

2    Q    The *corridos* that you said were written for Mr. Daniel

3    Sepulveda, my client, do you -- did you hear them yourself and

4    understand them?

5    A    I heard them.  But I'm not fluent in Spanish.  So I didn't

6    understand everything that was in the one video.

7    Q    And do you have anyone that has any first-hand knowledge

8    that those actually were written for him?

9    A    Well, the video was sent to him and it refers to him.  And

10   my investigation identified that one of his nicknames is *La*

11   *Nino*.  And the one video was called, "*La Guera y la nino*,"

12   which is -- my understanding was that it's just the (indisc.).

13   Q    So they don't actually identify him by name in these

14   songs?

15   A    I don't think so.

16   Q    And whoever's heard of it surmising that they're about

17   him?

18         **MS. PROFIT:**  Your Honor, again, I'm going to object

19   that this is argumentative.

20         **THE COURT:**  I'm going to allow that question.  I

21   don't think it's argumentative.

22         You can answer, if you know, Special Agent Donahue.

23         **THE WITNESS:**  Yes.  My partners that listened to the

24   songs believe they're about Daniel Sepulveda.

25               //

Donahue - Cross / By Mr. Sanchez                    31

1   **BY MR. SANCHEZ:**

2   Q    Okay, the ten individuals that you've mentioned that were

3   over a hill, were they ever identified?

4   A    No.  I don't believe they existed.

5            This is what your client told my partners while they

6   were transporting him.

7   Q    Okay, and the -- several weapons were found in my client's

8   home, correct?

9   A    That's correct.

10  Q    Were you aware that he is licensed to carry weapons by the

11  State of Texas?

12  A    No, I'm not.

13  Q    You didn't identify his license to carry at all?

14  A    I didn't see that.

15  Q    Okay, but if he were licensed, it would make sense that

16  he'd have several weapons, correct?

17  A    That's correct.

18           **MR. SANCHEZ:**  Pass the witness, your Honor.

19           **THE COURT:**  Okay, thank you.

20           And, Mr. Falcon, as to your client?

21           **MR. FALCON:**  Yes, your Honor.

22           **THE COURT:**  And, again, if you could please move that

23  microphone to you, Mr. Falcon.

24           **MR. FALCON:**  Yes, your Honor.

25           May I proceed, your Honor?

1           **THE COURT:**  Yes, sir.

2           **MR. FALCON:**  Thank you.

3                          **CROSS EXAMINATION**

4    BY MR. FALCON:

5    Q    Good morning, Agent.

6    A    Good morning, sir.

7    Q    I represent Mr. Evaristo Sepulveda.

8           And so we've been talking about 320 kilos, correct?

9    A    That's correct, sir.

10   Q    Okay, and you just started talking about the 320 kilos

11   that were seized.  But I want to go back.  And I want to -- I

12   want for you to tell us what exactly happened on that day.

13          When did you first learn that there was 320 kilos

14   being smuggled?

15          **MS. PROFIT:**  Your Honor, for purposes of --

16          **THE COURT:**  Right.  So I don't think we're going to

17   go into that much detail, Mr. Falcon, just because we could be

18   here for, you know, probably a couple weeks if we went into all

19   the aspects of the investigation.

20          It sounds like this lasted -- you know, different

21   aspects lasted over the course of years.  And, you know, for

22   purposes of the bond hearing, it's really not appropriate to go

23   into, you know, discovery.

24          But if you want to ask questions that are related to

25   your client's alleged involvement with that -- and you can

1   certainly ask specifics about --

2           **MR. FALCON:**  Your Honor --

3           **THE COURT:**  -- that.  But just asking him to go

4   through the entire thing, you know, point --

5           **MR. FALCON:**  Not the --

6           **THE COURT:**  -- by point --

7           **MR. FALCON:**  -- entire thing, your Honor.  I'm just

8   trying to find out exactly what happened.

9           Because he testified that there were 320 kilos that

10  were transported in an ATV that was allegedly being driven by

11  Mr. Daniel Sepulveda.  And I want to find out exactly what

12  happened with my client.

13          **THE COURT:**  Okay, if you --

14          **MR. FALCON:**  How is he involved?

15          **THE COURT:**  If you ask that, Mr. Falcon, that's fine.

16  But the question you asked was much broader than that.

17          It would have required him to, like, go back into the

18  beginnings of the investigation and each step leading up to

19  that, which is --

20          **MR. FALCON:**  I'll make the questions more specific,

21  your Honor.

22          **THE COURT:**  Yes, sir.

23          **MS. PROFIT:**  Your Honor, for purposes of the

24  detention hearing, the issue is the weight of the evidence

25  against the individual.

Donahue - Cross / By Mr. Falcon                    34

1           **THE COURT:**  Right.

2           **MS. PROFIT:**  So I think that we should not be too

3    far-reaching in getting into discovery in other areas.

4           I mean, I think that they're attempting to sort of

5    try this case before the Magistrate Court.

6           **THE COURT:**  Well, I just said that he can't do that.

7           But, by the same token, on direct, mister -- Special

8    Agent Donahue testified about that event and implicate

9    Mr. Falcon's client.

10          So, certainly, Mr. Falcon can ask specific questions

11   about that --

12          **MR. FALCON:**  Thank you.

13          **THE COURT:**  -- same event.

14          So you can go ahead.

15          **MR. FALCON:**  Okay, may I proceed?

16          **THE COURT:**  Yes, sir.

17          **MR. FALCON:**  Thank you.

18   **BY MR. FALCON:**

19   Q    Okay, so 320 kilos seized on what day?

20   A    January 17, 2019.

21   Q    Okay, and it's my understanding that those 320 kilos were

22   being transported and ended up at the river bank or --

23   A    Yes.  So the 320 kilos of cocaine was, you know, 11

24   bundles -- okay, 11 large bundles in burlap sacks.

25          So ten of those bundles were found either in the river or

Donahue - Cross / By Mr. Falcon                    35

1  on the river bank, right where the ATV crashed into the river.

2           One of those bundles, the 11th bundle, was found

3  approximately five yards from the house -- five to ten yards

4  from Americo Garcia's house, at 208 Midway Road.

5           Okay, and that bundle was found approximately five

6  to ten yards from where your client, Evaristo Sepulveda, and

7  Juan Garcia were standing during the smuggling event.

8  Q    Okay, and was that found on a road or was that found just

9  in the brush or where was that found?

10 A    The bundle was five yards from the house.  It's like an

11 open area.

12 Q    Okay, all right.  And do you have any evidence to indicate

13 that my client had any dealing with that specific bundle?

14 A    Yes.  He was standing five to ten yards from the bundle,

15 in an open area.

16          Then when agents responded, he fled from the

17 residence, in a vehicle, and drove maybe 30 yards away into a

18 barn.  The agent that encountered him said he was frantic.  Him

19 and Juan Garcia were trying to figure out something to do.

20          So he had a bag of corn in his hand and they were --

21 he said he laid there pretending to feed the single horse they

22 observed in the barn at the time.

23          He said they were really nervous.  They were dressed

24 really nice.  And in his experience, they were not dressed like

25 someone that was ranching or would go to feed horses all day or

Donahue - Cross / By Mr. Falcon                          36

1    attend to animals.

2    Q    And when you say that you were dressed, you would agree

3    with me, also, that they were not dressed in a way that would

4    indicate that they were ranching; is that what you're saying?

5    A    According to the agent, yes.

6    Q    Okay, now did anybody see my client handling the bundle of

7    cocaine that you just mentioned?

8    A    Not that I know of.

9    Q    Okay, now, you mentioned that Mr. Daniel Sepulveda was

10   identified as being the driver of the ATV, correct?

11   A    Correct.

12   Q    Okay, now, from the evidence that you gather, what is a

13   role that you alleged that my client had on this particular

14   date?

15   A    Your client was going to receive the cocaine at the house.

16   Q    Okay, and how do you know this?

17   A    Well, so the agent that encountered Evaristo Sepulveda has

18   encountered him on previous occasions, okay?

19         And then your client, Evaristo Sepulveda, was also

20   arrested by border patrol, in June 2017, for transporting one

21   illegal alien.

22   Q    Okay, now -- and I asked you this.

23         Do you have a confidential informant that indicated

24   to you that my client was specifically going to wait for the

25   cocaine at this particular location, or that's just your

1   conclusion?

2   A    No.  We don't have a confidential informant saying that he

3   was there to receive the cocaine.

4   Q    Okay, and do you have any text messages or any electronic

5   data that indicates that he was going to receive the cocaine?

6   A    Not that I observed so far.

7   Q    Okay, now, on the particular day that the cocaine was

8   seized, was there any cell phones retrieved from my client?

9   A    No.

10  Q    Okay, were there any cell phones that were seized from any

11  of the other individuals that you encountered on that day?

12  A    No.

13  Q    Okay, now, eventually, you seized some phones.

14          And it's your allegation that there was some

15  conversations between Daniel and Juan Garcia dealing with

16  cocaine; is that correct?

17  A    Correct.

18  Q    Okay, now, is there any conversation in that phone that

19  involves my client with the 320 kilos of cocaine?

20  A    I'm not sure.  There's thousands of conversations in that

21  phone.

22  Q    Okay.

23  A    A lot of them are all new messages and takes a long time

24  to go through.

25  Q    But as of right now, you cannot definitely tell this Court

Donahue - Cross / By Mr. Falcon                          38

1    that there is a conversation that deals with my client and, at

2    the same time, deals with the 320 kilos, correct?

3    A    I cannot.

4    Q    Okay, thank you.

5              Now, there's also a -- you gave some testimony

6    earlier about $1.4 million that were seized, correct?

7    A    Correct.

8    Q    Okay, and this was also at the river banks?

9    A    Correct.

10   Q    Okay, now, what do you claim is my client's role with that

11   $1.4 million?

12   A    According to the source's information, your client was

13   scouting from 32 Midway Road for that particular bulk (indisc.)

14   smuggling attempt.

15   Q    Okay, and on the day of the seizure, was my client ever

16   seen dealing with the 1.4, transporting it, doing anything with

17   the 1.4 million?

18   A    He was not.

19              But 32 Midway Road has been identified as a scouting

20   location during smuggling events along Midway Road.

21   Q    Okay, and it is through one source of information that you

22   conclude that my client was scouting?

23   A    Correct.

24   Q    Okay, and was my client detained on that occasion?

25   A    Yes.  He was encountered and detained on that location --

Donahue - Cross / By Mr. Falcon                    39

1   Q    Did he --

2   A    -- or on that -- on that day, at 32 Midway Road.

3   Q    Okay, and did he give any statements incriminating himself

4   with the 1.4 million?

5   A    Not that I know of.

6             According to my partners that were at that location,

7   he was being uncooperative --

8   Q    Okay.

9   A    -- at that point.

10  Q    Okay, so he never admitted participation in the 1.4-

11  million transaction, correct?

12  A    I do not know.

13  Q    Okay, now, you testified that, throughout the course of

14  your investigation, there was some money that was seized from

15  Daniel's home?

16  A    Correct.

17  Q    Is that correct?

18            Okay, did you seize any large amounts of money from

19  Mr. Evaristo Sepulveda's home?

20  A    We did not.

21  Q    Okay, and you testified that what was seized was about 40

22  grams of cocaine and how much marijuana, sir?

23  A    It was about -- I think approximately 200 grams.

24  Q    Okay, now, also I believe that you testified that there

25  was another cell phone -- and I can't remember which one.  But

Donahue - Cross / By Mr. Falcon                    40

1   there was a cell phone that had about ten conversations or ten

2   transactions dealing with cocaine, correct?

3   A    Correct.

4   Q    And within those conversations, is there any conversation

5   that involves my client dealing with those transactions?

6   A    I don't know.

7   Q    Okay, you also talked about some songs that were made

8   about one of the Sepulvedas, correct?

9   A    Correct.

10  Q    But you would agree with me that there's no songs dealing

11  about my client, right?

12  A    I don't know that.

13  Q    Okay, now, in your opinion, what was my client's role

14  dealing with the 320 kilos?

15  A    I believe he was going to receive that cocaine and then

16  transport it to another location.

17  Q    Okay, and that was based on your conclusion, correct?

18         MS. PROFIT:  Your Honor, this has been asked and

19  answered.

20         THE COURT:  Right.  I think that one --

21         MR. FALCON:  I'll move on.

22         THE COURT:  -- was asked --

23         MR. FALCON:  I'll move on.

24  //

25  //

Donahue - Cross / By Mr. Falcon                    41

BY MR. FALCON:

Q    I believe also that there were some testimony that some of

the agents were threatened by some of the co-Defendants?

A    That's correct.

Q    Okay, but you would agree with me that my client never

made any of those threats, correct?

A    No.  I spoke to your client on that day.  He was

cooperative.

Q    Okay, and as far as you're concerned, my client has not

made any threats to any agents or to anybody, correct?

A    No.  That day I talked to him, he was respectful.

Q    Okay, on the day that my client was arrested for this

case, did you seize a cell phone from him?

A    Yes.  Several cell phones were seized from the residence.

Q    Okay, and I believe that you testified that there was some

videos there dealing with some -- some cartel videos.  I think

that's what you mentioned?

A    That's correct.

Q    Okay, but there's nothing there that indicates that my

client participated in those videos, correct?

A    Not that I found yet.

Q    Okay, and in that particular cell phone, did you find any

conversations that incriminated my client with the 320 kilos?

A    I haven't found any conversations about that yet.

Q    Okay, were any of the -- any of the bundles -- the ten or

Donahue - Cross / By Mr. Falcon                          42

1   eleven bundles of cocaine that were seized, were any of those

2   tested for fingerprints or anything like that?

3   A    No.

4   Q    Okay, you mentioned that there was a disappearance of an

5   individual.  And I think his name was Joaquin.

6           Do you have evidence that indicates that my client

7   was involved in any of that?

8   A    No.

9   Q    Okay, also, throughout the course of your investigation, I

10  know that you testified that my client's role was allegedly to

11  receive the cocaine at the house.

12          Is there any other information that you have that

13  involves my client with the 320 kilos, that he was going to do

14  something else?

15          **MS. PROFIT:**  Your Honor, this has been asked and

16  answered, asked and answered.

17          **THE COURT:**  You can answer that if you're able to.

18          **THE WITNESS:**  Can you repeat the question, sir?

19  **BY MR. FALCON:**

20  Q    Yes.  Aside from the fact that you claim that my client

21  was going to receive the cocaine at the house -- correct?

22  A    Okay.

23  Q    -- is there anything else -- any other evidence that

24  indicates that he was going to do something more, dealing with

25  that cocaine?

Donahue - Cross / By Mr. Ramirez                    43

1          Was he going to transport it; was he going to wrap

2    it; was he going to sell it; was he going to do anything else?

3    A    I don't have that information.  But he's been observed in

4    that same area on numerous occasions (indisc.) camera,

5    pictures, scouting.

6          Agents have observed Evaristo Sepulveda walking down

7    in the same area, scouting for law enforcement.

8    Q    Okay, and I think that you testified that mister -- strike

9    that.  I'm sorry.  And on the date of the seizure, nobody was

10   arrested, correct?

11   A    That's correct.

12          **MR. FALCON:**  Pass the witness, your Honor.

13          **THE COURT:**  Okay, Mr. Ramirez?

14          **MR. RAMIREZ:**  Thank you.

15                    **CROSS EXAMINATION**

16   BY MR. RAMIREZ:

17   Q    Good morning, Agent Donahue.

18   A    Good morning, sir.

19   Q    Is that correct; Donahue?

20   A    Yes, sir.

21   Q    All right.  My name is Gocha Allen Ramirez.  And I

22   represent Juan Garcia.  I just have a few questions to ask of

23   you.

24          Just want to be clear on this.  You are not

25   testifying about the seizure of the 320 kilos of cocaine from

Donahue - Cross / By Mr. Ramirez                    44

1   personal knowledge, are you?  You were not there?

2   A    I was not there, no.  I showed up to the border patrol

3   station on that particular day.

4   Q    Right.  But you were not at the location where the cocaine

5   was seized on the day it was seized?

6   A    That's correct.

7   Q    All right.  Are you aware of the fact that there was a

8   high-speed chase between law enforcement and the vehicle that

9   was transporting that cocaine?

10  A    Yes, I was.

11  Q    All right.  Are you also aware -- or can you tell the

12  Court whether or not Juan Garcia was on that property before

13  the high-speed chase, or did he arrive after the high-speed

14  chase?

15  A    The agents that I talked to that were involved in the

16  seizure, when they drove around the property, the seizure

17  happened.  They didn't particularly observe Juan Garcia there.

18  But during the smuggling event, they didn't -- they also didn't

19  see any other vehicles arrive to the property.

20           So the agents believe that Juan Garcia was there

21  during the entire smuggling event.

22  Q    All right.  But so you can't tell the Court whether Juan -

23  - and by the way, this is -- this property where the cocaine

24  was seized is property that belongs to whom?

25  A    Juan Garcia's father.

Donahue - Cross / By Mr. Ramirez                    45

1  Q    Okay, it doesn't belong to Juan Garcia, does it?

2  A    Not that I know.

3  Q    And there was livestock on the property; is that correct?

4  A    According to agents, yes.

5  Q    And you have heard testimony, when this hearing started,

6  from a witness or two that Juan Garcia would take care of that

7  livestock?

8  A    Yeah.  He told me.  I've talked to Juan Garcia before.

9  He's told me, on a case, there are livestock on the property.

10  Q    All right.  And so you can't tell the Court whether or not

11  Juan Garcia was already on the property taking care of the

12  livestock before the high-speed chase or whether he arrived

13  afterwards; you really don't know, do you?

14        **MS. PROFIT:**  Your Honor, that's actually been asked

15  and answered.

16        **THE COURT:**  Okay, you can answer if you're able.

17        **THE WITNESS:**  Well, he was obviously there during the

18  smuggling attempt because an agent encountered him --

19  **BY MR. RAMIREZ:**

20  Q    Right.  But there was a high --

21  A    -- during the chase of the ATV.

22  Q    During the chase of the ATV?

23        In other words, while the ATV was speeding through

24  that property, Juan Garcia was seen?

25  A    Yes.  When agents were -- when the ATV left the property,

Donahue - Cross / By Mr. Ramirez                    46

1   more agents responded.

2   Q    Okay.

3   A    The agents that were responding came from the north of the

4   property.

5   Q    All right.

6   A    And from Business 80 -- or Expressway 83.

7   Q    All right.

8   A    They didn't observe any other vehicle drive into the

9   property.

10  Q    Okay, so if Juan Garcia was already on the property --

11             And it wouldn't be unusual for him to be on that

12  property, would it?

13  A    No.  He's down there quite often.

14  Q    Okay, and then there's a high-speed chase; that you-all

15  think that he's already there.

16             Is he involved in that high-speed chase in any way?

17  A    Yes.  He was approximately five to ten yards from where

18  the ATV turned around.

19  Q    Right.  But was he on the ATV?

20  A    Agents did not observe him on the ATV.

21  Q    Okay, did they observe him speak to anyone on the ATV?

22  A    I do know that.

23  Q    Okay, did they ever see the ATV stop near Juan Garcia?

24  A    Yes.  It stopped approximately five to ten yards from

25  where he was standing.

Donahue - Cross / By Mr. Ramirez                    47

1   Q     From where he was standing during the chase?

2   A     Yes.

3   Q     Okay, and did see Juan Garcia make any movements towards

4   the ATV?

5   A     I can't testify to that.

6   Q     Okay, now, is this the time that Juan Garcia had the sack

7   of feed in his hand?

8   A     No.

9   Q     Okay, when did he have the sack of feed in his hand?

10  A     The agent did not observe him have anything in his hand.

11  Q     Okay, when did they observe him with a sack of feed in his

12  hand?

13  A     So when the ATV reached the house, the agent observed two

14  vehicles -- two subjects get off the ATV.  One of the subjects

15  was Daniel Sepulveda, okay?

16          Moments later, at least three marked U.S. Border

17  Patrol vehicles responded.  Two of those vehicles drove around

18  the block, to the south; the one vehicle drove to the north.

19          That individual -- the agent driving the vehicle to

20  the north then observed your client, Juan Garcia, and Evaristo

21  Sepulveda hastily get into a vehicle and then drive

22  approximately 30 yards away to a barn, okay?

23          He then approached them and encountered (indisc.)

24  subjects.  He observed Evaristo Sepulveda carrying a bag of

25  what appeared to be corn feed.

Donahue - Cross / By Mr. Ramirez                    48

1  Q    Okay, and this was after the cocaine had been dropped by

2  the ATV?

3  A    Yes.  One bundle landed approximately five to ten yards

4  from where Juan Garcia was standing.

5  Q    Okay, did anybody observe Juan Garcia touch the bundle,

6  grab the bundle; do anything with the bundle?

7  A    The agents observed this -- (indisc.) observed -- because

8  it was a fluid -- fluidity of the situation, he observed just

9  movement around the ATV and he observed -- moments after agents

10 started coming, the agents believe that this individual's at

11 the house, including your client, Juan Garcia, were notified

12 that law enforcement was coming.  And that is the reason why

13 they got back in the vehicle.

14 Q    Okay, now, besides the fact that the ATV was on my

15 client's father's property, did you have any other -- or do you

16 have any other evidence that Juan Garcia was involved with the

17 320 kilos of cocaine, besides the fact that he was on his

18 father's property or the high-speed chase took place?

19 A    Yeah.  So through analysis of conversation on Daniel

20 Sepulveda's phone, your client, Daniel Sepulveda, had talked

21 about at least ten cocaine smuggling events, from June to

22 August 2019.

23 Q    No.  But we're talking about 320 kilos here.  We're not --

24 had they been charged with other cocaine events?

25 A    Not yet.

Donahue - Cross / By Mr. Ramirez                    49

1  Q    All right.  I'm talking about the 320 kilo seizure that

2  we're here on today.

3           Is there any evidence that you have besides the fact

4  that he was on his father's property where this high-speed

5  chase took place, that would link him to those 320 kilos?

6  A    Not at the moment.  I'm still analyzing stuff.

7  Q    Okay, now, are you telling the Court that the -- that

8  there were horses on this property at the time?

9  A    Yes.  The one border patrol agent that encountered Juan

10 Garcia stated he saw at least one horse.

11 Q    Okay, did that border patrol agent even speak to

12 Mr. Garcia?

13 A    Yes.

14 Q    Okay, and do you know what that conversation entailed?

15 A    He said it was a very short conversation.

16           He said Juan Garcia and Evaristo Sepulveda appeared

17 frantic.  And they didn't -- they appeared that they didn't

18 know what they were going to do.  They -- he stated that they

19 appeared to be pretending to feed the horses.

20           The conversation was extremely short because the

21 agent felt that the other agent that was chasing the ATV was in

22 danger.  So he had abruptly leave Juan Garcia and Evaristo

23 Sepulveda, and then go respond to the river bank.

24 Q    My question was, do you know what the conversation

25 entailed?

Donahue - Cross / By Mr. Ramirez                     50

1   A    Yes.  He just talked to him briefly.  And they said they

2   were there feeding the horses.

3   Q    Okay, now, you've said that you also have information

4   regarding Juan Garcia and these other alleged drug offenses

5   through text messages?

6   A    That's correct.

7   Q    Text messages with whom?

8   A    Daniel Sepulveda.

9   Q    Okay, can you tell the Court -- I mean, those -- that was

10  a very vague statement.

11        Can you tell the Court -- give the Court one example

12  of a text message involving Daniel Sepulveda and Juan Garcia in

13  a drug trafficking incident?

14  A    So they're talking about receiving tacos and buckets on

15  the river bank.

16        In our investigation, we identified that tacos are

17  code for "cocaine," and so are buckets.

18  Q    Okay, and this is a phone that is in Juan Garcia's name?

19  A    No.  It's a phone seized from Daniel Sepulveda.

20  Q    Okay.

21  A    I don't know who is was linked back to.  But the phone was

22  seized from Daniel Sepulveda.

23  Q    So how is it linked to Juan Garcia; that text message?

24  A    Well, the name on his -- the name that -- Daniel Sepulveda

25  talked to someone named, "Juanito," okay?

Donahue - Cross / By Mr. Ramirez                               51

1   Q    Okay.

2   A    End of text messaging strings, Daniel Sepulveda sends a

3   picture of Juan Garcia.  And also, Juan Garcia sends his

4   address, which is 207 (indisc.) to Daniel Sepulveda.

5   Q    Okay, but the string involves a picture.  You say there's

6   a picture of Juan Garcia in the stream and there's an address

7   on the stream?

8   A    Yes.

9   Q    Okay.

10  A    During a conversation -- yeah, during the life of the

11  conversation, which is several months.

12  Q    Right.  But there's not anything to link the phone number

13  to Juan Garcia, is there?

14  A    I don't know.

15       **MS. PROFIT:**  Your Honor, this is getting into

16  discovery.  I mean, this is just --

17       **THE COURT:**  Okay, now, that was a --

18       **MS. PROFIT:**  -- going very broad.

19       **THE COURT:**  That was okay, since you brought out that

20  there were a number of these text messages that were --

21       But I don't think we need to go any further.  I mean,

22  it's clear the nature of that.

23       **MR. RAMIREZ:**  I don't intend to, Judge.

24       **THE COURT:**  Yes, sir.

25  //

Donahue - Cross / By Mr. Ramirez                    52

1  **BY MR. RAMIREZ:**

2  Q    Now, then you -- I think you discussed some -- there was

3  some discussion of somebody shooting out cameras that DEA had

4  set up on Midway Road; is that correct?

5  A    That's correct.

6  Q    Okay, and you never did mention -- my client was not

7  involved in that as far as you know?

8  A    As far as I know now, no.

9  Q    Okay, and you also told the Court that you interviewed

10 Juan Garcia's father after this incident; I think, the day

11 after?

12 A    Correct.

13 Q    And you found it odd that he was not able to give you Juan

14 Garcia's address?

15 A    Correct.

16 Q    Okay, but he -- you didn't ask him if he knew where Juan

17 lived; you asked him for Juan's address, didn't you?

18 A    No.  I said where he lived.

19 Q    All right.  And --

20 A    He said he didn't know.

21 Q    He said he didn't know, okay.

22 A    That's correct.  So, I mean, if you don't know where

23 someone lives, I'm assuming you don't know their address.

24 Q    Right.  And were you aware of the fact that Juan had just

25 moved to a new location with his girlfriend?

Donahue - Cross / By Mr. Ramirez                53

1   A    No, I'm not aware of that.

2   Q    Okay, now, I think you also discussed -- and this is also

3   not something that Juan is charged with -- but the fact that

4   aliens had been discovered on his father's property?

5   A    Correct.

6   Q    Okay, do you any evidence that Juan Garcia was involved in

7   the smuggling of illegal aliens?

8   A    Well, ATV left the property -- well, remained on the

9   property.  But ATV left an area where he was standing, then

10  returned to the area where he was encountered.

11       And then it was foot sign, next to the ATV's footprints,

12  matching one of -- it was actually matching Rene Sepulveda,

13  which is Sepulveda -- Evaristo Sepulveda and Rene Sepulveda.

14  He's one of the younger brothers.

15       And he's been identified as (indisc.).  That foot sign was

16  next to an ATV, which indicated to agents that that was his

17  (indisc.) ATV.

18       The ATV also traveled to the river.

19  Q    Was the foots -- did the foot sign, Juan Garcia's foot

20  sign?

21  A    It did not match Juan Garcia's foot sign, no.

22  Q    Okay, my question was, do you have any evidence that Juan

23  Garcia was involved with the smuggling or the hiding of the

24  aliens?

25            **MS. PROFIT:**  Your Honor, I think that the agent

Donahue - Cross / By Mr. Ramirez                    54

1    should be allowed to finish his discourse.  He was attempting

2    to answer the question.

3              **MR. RAMIREZ:**  Well, that the problem, Judge, is that

4    he --

5              **MS. PROFIT:**  And he might not have liked the answer

6    he was getting, but --

7              **MR. RAMIREZ:**  It isn't discourse.  And --

8              **THE COURT:**  Right.

9              **MR. RAMIREZ:**  -- we're supposed to do a question and

10   answer.

11             **THE COURT:**  And, Special Agent Donahue, can you

12   answer the last question.

13             **THE WITNESS:**  Yeah.  So on that occasion, no one was

14   arrested.  Juan Garcia was not arrested.

15             However, five illegal aliens, and an additional two

16   illegal aliens were located in and around a barn, approximately

17   30, 40 yards away from where you client was standing.

18             I would find that extremely odd that, if you're on

19   someone's property you don't know, that the people are 40 yards

20   away from you.

21   **BY MR. RAMIREZ:**

22   Q    Is that Juan Garcia's property?

23   A    That's his father's property.

24   Q    Right.  So it's not his property, is it?

25   A    But he's down there.

Donahue - Cross / By Mr. Ramirez                               55

1  Q    Right.  He's on his father's property, where he goes

2  almost --

3           MS. PROFIT:  Your Honor, this is kind of

4  argumentative.

5           THE COURT:  Okay, right.

6           And you can just make that argument later,

7  Mr. Ramirez.  You don't need to go back and forth for the agent

8  on that part.  I mean, obviously, that's -- you know what he's

9  basing it on.

10          MR. RAMIREZ:  All right.

11  BY MR. RAMIREZ:

12  Q    Now, let me ask you about the -- this disappearance of

13  this Mr. Sepulveda.

14          You don't have any concrete evidence that Juan

15  Garcia was involved in that disappearance, do you?

16  A    Not yet, no.

17  Q    Okay, the bulk seizure of over $1.4 million; you don't

18  have any evidence that Mr. Garcia was involved with any of

19  that, do you?

20  A    I do not.

21  Q    Okay, you didn't find any *corridos* on Mr. Garcia's phone

22  or you haven't found any *corridos* written about him, have you?

23  A    I have not yet.

24  Q    Okay, there -- did you seize Mr. Garcia's phones when he

25  was arrested?

Donahue - Cross / By Mr. Ramirez                    56

1   A    I believe there was approximately nine phones seized from

2   Juan Garcia's residence.

3   Q    Okay, and he lives with his wife.

4            Some of those phones belonged to his wife, did they

5   not?

6   A    Well, I believe it was his girlfriend.

7   Q    His girlfriend?

8   A    Yes.

9   Q    Okay, and did you find any pictures of drugs on those

10  phones?

11  A    I haven't gone through those phones yet.

12  Q    Have you found -- oh, you haven't gone through the phones.

13           So you haven't found any pictures of drugs; haven't

14  found any violent videos?

15           **MS. PROFIT:**  Your Honor, asked and answered.  He said

16  he hasn't gone through the phones.

17           **THE COURT:**  All right.  I mean, that's -- you don't

18  need to ask that since he hasn't gone through them.

19  **BY MR. RAMIREZ:**

20  Q    Now, was Mr. Garcia cooperative with you when he was

21  arrested?

22  A    The agents say that he was cooperative.

23  Q    All right.  Are you aware that he's a United States

24  citizen?

25  A    I'm aware of that.

1   Q    Okay, are you aware of the fact that he has no prior

2   convictions?

3   A    Yes.

4   Q    Okay, are you aware of the fact that no drugs were seized

5   from his home?

6   A    I am.

7   Q    Okay, were any threats made by Mr. Garcia to any of the

8   agents that arrested him?

9   A    Not that I'm aware of.

10  Q    Okay, were there any attempts to flee by Mr. Garcia?

11  A    When he was arrested?

12  Q    Yes.

13  A    No.

14  Q    Okay, there were no threats made by Mr. Garcia to the

15  agents.  I want to ask you a question though.

16           Have agents offered people money to testify against

17  Mr. Garcia in Starr County?

18  A    Not that I know.

19  Q    Okay, are you aware of whether or not Mr. Garcia's ex-wife

20  has been offered money to testify against him?

21           **MS. PROFIT:**  Your Honor, I'm going to object to any

22  line of questioning that identifies any individuals that may or

23  may not be cooperating.

24           The question was asked, has -- if he was aware if

25  anyone was being offered money to testify against Mr. Garcia.

Donahue - Cross / By Mr. Ramirez                    58

1          That agent has answered, "No," which should encompass

2     the subsequent --

3          **THE COURT:**  Right.  Well --

4          **MS. PROFIT:**  -- question.

5          But to the extent we're trying to get into

6     identifying people who may have been provided information,

7     we're dealing with an organization that is extremely violent

8     and the Government says, "That's discovery and it's not here."

9          **THE COURT:**  Right.  And I do agree that that is

10    really discovery.

11         And it also with -- you know, we were going to stay

12    far away from anything that might attempt to identify anybody

13    that might be cooperating or not cooperating or anything like

14    that that's -- you know, that type of information.  As

15    discovery proceeds, it may be appropriate at some point.  But

16    now is not the time for that.

17         So that is sustained.

18         **MR. RAMIREZ:**  Okay.

19    **BY MR. RAMIREZ:**

20    Q    With reference to Mr. Garcia's travels to Mexico, did you

21    verify his travels to Mexico?

22    A    Yes.  One of my partners did.

23    Q    Okay, what did you find?

24    A    Since late October, he has entered the United States via

25    Mexico on ten occasions.

Donahue - Redirect / By Ms. Profit                59

1  Q    Okay, and would that be unusual, in your opinion, for a

2  person that lives on the border to --

3          **MS. PROFIT:**  Your Honor, he's asking the agent to

4  speculate.

5          **THE COURT:**  Okay, yeah.  I don't think that's

6  necessary.

7          I mean, you can -- it doesn't seem unusual to me,

8  Mr. Ramirez.  So that's the type of argument you can make.

9          **MR. RAMIREZ:**  Okay, that's all I have, Judge.  I pass

10 the witness.

11         **THE COURT:**  Ms. Profit?

12         **MS. PROFIT:**  Yes.

13                     **REDIRECT EXAMINATION**

14 **BY MS. PROFIT:**

15 Q    In terms of a review of Daniel Sepulveda's phone, did the

16 Government find information that Juan Garcia arranges payments

17 for taxes for Americo Garcia's property, if you know?

18 A    I don't remember that, no.

19 Q    Okay, now, in terms of Mr. Evaristo Sepulveda, there were

20 calls, correct, in terms of his phone where he was discussing

21 the purchase of one kilogram of cocaine, correct?

22 A    Yes.

23 Q    That was your earlier testimony?

24 A    There was text messages between Evaristo Sepulveda and

25 another subject discussing the purchase of one kilogram of

```
                  Donahue - Redirect / By Ms. Profit              60

 1   cocaine.

 2   Q    And he did have on his phone the torture videos, correct?

 3   A    Correct.

 4   Q    Now, in terms of -- and at the time of the search warrant

 5   that was executed at Juan Garcia's residence, there was

 6   approximately $11,552 in United States currency that was

 7   seized; is that correct?

 8   A    That's correct.

 9   Q    Now, when you talk in terms of --

10        THE COURT:  I'm sorry.  I didn't catch that.  Where

11   was the 11,000 found?  At who's --

12        THE WITNESS:  That was found at 207 (indisc.), which

13   is the residence of Juan Garcia.

14        THE COURT:  Okay.

15   BY MS. PROFIT:

16   Q    When you talk in terms of taking care of livestock,

17   particularly with respect to the Midway property, in terms of

18   observations by agents, what has the livestock -- what purpose

19   do the agents believe that the livestock satisfies?

20        MR. RAMIREZ:  Your Honor, I'm going to object.  That

21   calls for speculation on the part of the agent.

22        MS. PROFIT:  I think he can explain it enough so that

23   it we'll know that it's not -- the timing --

24        THE COURT:  Okay.

25        MS. PROFIT:  -- in terms of the goats, if you
```

```
                   Donahue - Redirect / By Ms. Profit          61
```

 1   would --

 2           **THE COURT:**  You can answer, if you're able.

 3           **THE WITNESS:**  So the agents that are (indisc.) that

 4   frequently do surveillance in the area of 208 Midway Road, they

 5   observed days, sometimes weeks, that have gone by where the

 6   goats have not left the (indisc.).

 7           They observed that, pretty much on every single

 8   smuggling attempt that happens in the area of Midway Road, the

 9   goats are released from their pens and (indisc.) walking with

10   those goats down to the river banks.

11   **BY MS. PROFIT:**

12   Q    Now, in terms of Juan and (indisc.) Garcia, in terms of

13   the cell phone communications -- when there was a communication

14   in terms of Daniel Sepulveda and his wife at the time of the

15   seizure, was there any mention made of Juan Garcia at that time

16   in that communication?

17           And I'm talking about the seizure of the 320 kilograms of

18   cocaine.

19   A    Yes.  So during the text messages shared between Daniel

20   Sepulveda and Daniel Sepulveda's wife, on January 17, Daniel

21   Sepulveda's wife states that she's with the subject known as

22   Juanito.

23   Q    And Juanito has been identified during the course of the

24   investigation as who?

25   A    Juan Garcia.

Donahue - Recross / By Mr. Sanchez                    62

1   Q    And was there any suggestion that she may have picked him

2   up or rescued him in the string of the conversation?

3   A    Yes.  Based on the conversation, it appears that Daniel

4   Sepulveda's wife picked up Juan Garcia.

5   Q    And that was on the day of the smuggling, correct?

6   A    Correct.

7            **MS. PROFIT:**  No further question.

8            **THE COURT:**  Okay, any follow-up as to those specific

9   things?

10           **MR. SANCHEZ:**  Yes, your Honor.

11           **THE COURT:**  Okay, yes, sir.

12           Keep it brief, if possible.

13                        **RECROSS EXAMINATION**

14  BY MR. SANCHEZ:

15  Q    Where did she pick him up?

16  A    I don't know.

17  Q    And this is the same individual that was with Evaristo

18  Sepulveda in the barn?

19  A    Yes, we believe so.  Yes.

20  Q    Did any of the agents ever see her go and pick him up at

21  the barn?

22  A    An agent encountered Juan Garcia and Evaristo Sepulveda at

23  the barn, correct.

24  Q    Right.  But did they ever see Daniel Sepulveda's wife go

25  pick him up there, at the location?

```
                    Donahue - Recross / By Mr. Falcon              63
```

1   A    Not that I know of.

2   Q    And that conversation, you found just mentions someone

3   named Juanito, but you're not sure who that is?

4   A    I believe it's Juan Garcia.

5   Q    That's your belief.  But you're not sure who it is?

6           **MS. PROFIT:**  Asked and answered.

7           **THE COURT:**  Right.  I don't think he -- that's

8   sustained, since --

9           **MR. SANCHEZ:**  Okay.

10  **BY MR. SANCHEZ:**

11  Q    So do you have any independent knowledge or proof that she

12  actually picked up Juan Garcia, the accused in this case, on

13  that day?

14          **MS. PROFIT:**  That also has been asked and answered.

15          **THE COURT:**  You can answer, if you know.

16          **THE WITNESS:**  No.

17          **MR. SANCHEZ:**  Pass the witness.

18          **MR. FALCON:**  May I proceed, your Honor.

19          **THE COURT:**  Yes, sir.

20          **MR. FALCON:**  Briefly.

21                        **RECROSS EXAMINATION**

22  **BY MR. FALCON:**

23  Q    You talked about the sale of one kilo of cocaine, where,

24  allegedly, my client was involved, correct?

25  A    Yes.  The message between Evaristo Sepulveda and this

1   other subject, it happened on February 4th, which would be one

2   day prior to the search warrant and arrest of Evaristo

3   Sepulveda (indisc.).

4   Q    February 4 of this year or last year?

5   A    Yes.  February 4, 2020.

6   Q    Okay, and, of course, that was close to a year after the

7   seizure of the 320 kilos, correct?

8   A    Yeah.  Close to a year, yes.

9   Q    Okay, you talked about one bundle that was very close to

10  my client.

11            That bundle was dropped by the ATV, correct?

12            **MS. PROFIT:**  Your Honor, this is going beyond the

13  scope of redirect.

14            **THE COURT:**  I think was definitely covered before.

15  But he can go ahead and answer that if it relates to something

16  that was part of redirect.

17            And I assume it does, Mr. Falcon?

18            **MR. FALCON:**  Yes, your Honor.

19            **THE COURT:**  Okay, you can go ahead, mister -- Agent

20  Donahue.

21            **THE WITNESS:**  Can you just repeat your question, sir?

22  **BY MR. FALCON:**

23  Q    Yes.  So you talked about one bundle of cocaine that was

24  maybe five to ten yards from my client at the time that the 300

25  kilos -- 320 kilos were seized, correct?

Donahue - Recross / By Mr. Falcon                    65

1   A    Yes.  That one bundle contained many larger -- many other

2   bundles of cocaine.

3   Q    Yes.  And my question to you, was that bundle dropped by

4   the ATV?

5   A    I'm assuming it fell off the ATV or it was removed from

6   the ATV by your client.

7   Q    Nobody saw my client removing that bundle, correct?

8   A    The agents saw -- they saw the two individuals getting off

9   the ATV, and then they saw other activity around the ATV.

10  Q    But they didn't see my client removing it?

11          **MS. PROFIT:**  Your Honor, it's been asked and answered

12  several times.  And it is beyond the scope of --

13          **THE COURT:**  Right.

14          **MS. PROFIT:**  -- redirect.

15          **THE COURT:**  Well, I mean, the agent could have just

16  said, "No."

17          **MR. FALCON:**  It was just a yes or a no, your Honor.

18          **THE COURT:**  Right.

19          **MR. FALCON:**  That's what I'm asking; a yes or a no.

20          **THE COURT:**  I think the answer is, "No."  Correct?

21  They didn't -- they saw activity, but not specifically what he

22  was asking?

23          **THE WITNESS:**  Yes.  The agent did not observe

24  Evaristo Sepulveda remove the (indisc.).

25          **MR. FALCON:**  Nothing further, your Honor.

Donahue - Recross / By Mr. Ramirez                    66

1              THE COURT:  Okay.

2              MR. RAMIREZ:  Just a couple, Judge.

3              THE COURT:  Yes, sir.

4                       RECROSS EXAMINATION

5    BY MR. RAMIREZ:

6    Q    I just wanted to clear up this last statement that you

7    gave Ms. Profit about believing that Juanito, my -- that

8    Juanito was picked up by Daniel Sepulveda's wife; is that

9    correct?

10   A    Ariana Sepulveda.

11   Q    Okay, was it your testimony, on direct, that Juan Garcia

12   drove from one location on the property to another, to the

13   barn, after the agents arrived?

14   A    That's correct.

15   Q    All right.  And was that vehicle that he drove in -- was

16   that found on the property after the drugs were -- were

17   located?

18   A    I don't know.

19   Q    Okay, but he had a vehicle, didn't he?  Obviously, he was

20   driving one.

21   A    Yeah, he was driving a vehicle.

22   Q    Okay, do you know why somebody would need to pick him up

23   then?

24   A    I don't know if he drove from the property or he walked

25   from the property.

Donahue - Recross / By Mr. Ramirez                    67

1    Q    Okay.

2    A    When other agents arrived there, they (indisc.).

3    Q    Okay, did --

4          MS. PROFIT:  That's been asked and answered, your

5    Honor.

6          THE COURT:  You can go ahead.

7          MR. RAMIREZ:  Thank you.

8    BY MR. RAMIREZ:

9    Q    What leads you to believe that the Juanito mentioned in

10   that message was Juan Garcia?

11   A    Was also the same individual -- Juanito is the person that

12   Daniel Sepulveda was talking to in various text messages from

13   June through August, talking about the cocaine bundles.

14   Q    Well, are you aware of the fact that Daniel Sepulveda has

15   a brother-in-law named Juanito?  Were you aware of that?

16   A    No, I'm not.

17         MR. RAMIREZ:  Okay, I have no further questions, your

18   Honor.

19         THE COURT:  All right.  I assume that's it.

20         We'll go ahead and -- you can step down, Agent

21   Donahue.  Thank you.

22         THE WITNESS:  Thank you, Judge.

23         THE COURT:  And before we -- so we'll go ahead and

24   hear argument on the issue of bond as to each of the

25   Defendants.

1          Before we do that, though, I am going to take a

2    recess for a few minutes to give everybody a break for here.

3    So we'll say 10 minutes, and then we'll pick up again.

4          **THE MARSHAL:**  All rise.

5     **(Recess taken)**

6     **(Requested transcription concluded at 11:32 a.m.)**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    __April 26, 2020__

                Signed                                          Dated



                         *TONI HUDSON, TRANSCRIBER*